843 F.2d 145
 Clarence CRAIG and Duveen A. Craig
v.
LAKE ASBESTOS OF QUEBEC, LTD., et al.
v.
CHARTER CONSOLIDATED P.L.C., Charter Consolidated
Investments P.L.C., Central Mining Finance Ltd., Charter
Consolidated Services Ltd., British South Africa Company,
Consolidated Mines Selection Co., Ltd.
Appeal of CHARTER CONSOLIDATED P.L.C., Charter Consolidated
Investments P.L.C., Central Mining Finance Limited, Charter
Consolidated Services Ltd., British South Africa Company,
and Consolidated Mines Selection Committee Limited
(collectively "Charter").
 No. 87-1254.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 2, 1987.
Decided March 31, 1988.
Rehearing Denied April 29, 1988.
 
 Werner L. Polak (argued), Mary Ann Jacoby, Joseph F. Haggerty, Shearman & Sterling, New York City, Daniel Segal, Steven R. Fischer, Leslie A. Hayes, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, Pa., for appellant.
 Edward W. Madeira, Jr. (argued), Edmund B. Spaeth, Jr., Richard W. Foltz, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., Myron J. Bromberg, Porzio, Bromberg & Newman, Morristown, N.J., for appellee, Lac d'Amiante de Quebec, Ltd.
 Hal C. Pitkow, Michael J. Witt, Hal C. Pitkow & Associates, Philadelphia, Pa., for appellees, Clarence and Duveen A. Craig.
 Before SLOVITER, BECKER and COWEN*, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I. Issue
 
 1
 The district court held, following a trial on the issue, that appellant Charter Consolidated P.L.C. was liable under New Jersey law for the tort obligations of its subsidiary Cape Industries, P.L.C. on an "alter ego " or "piercing the corporate veil" theory. Because we conclude that New Jersey law does not allow for piercing the corporate veil absent a greater degree of domination of the subsidiary by its parent than that found here by the district court, we will reverse.
 
 II. Procedural and Factual Background
 
 2
 The original plaintiffs, Clarence and Duveen Craig, New Jersey citizens, brought suit in a Pennsylvania state court to recover damages for personal injuries suffered by Clarence Craig as a result of his exposure to asbestos fibers while employed at the Owens-Corning plant in Berlin, New Jersey. Ten of the eleven defendants named were companies which manufactured, sold or supplied asbestos to Owens-Corning. Included among the defendants were appellee Lake Asbestos of Quebec, Ltd. (LAQ), North American Asbestos Corporation (NAAC) (a subsidiary of Cape Industries), and Continental Products Corporation (CPC), allegedly the "successor in interest" to NAAC. After the action was removed to federal court on the basis of diversity jurisdiction, defendant LAQ impleaded Charter Consolidated and five of its wholly-owned subsidiaries (hereinafter jointly "Charter") as third-party defendants, alleging that they were the "alter ego entities" of certain of the suppliers of asbestos to Owens-Corning, specifically Cape Industries and several subsidiaries of Cape (hereinafter jointly "Cape"), and therefore jointly and/or severally liable with LAQ for plaintiff's injuries or liable over to LAQ for contribution or indemnity. Cape itself was not made a defendant either by the Craigs or by LAQ.
 
 
 3
 All the original defendants settled with plaintiffs,[1] including LAQ which settled conditionally so as to maintain its third-party action against Charter. LAQ and Charter stipulated that the third-party action would be tried by the court without a jury, and that the sole issue tried would be whether Charter was responsible for the liability share of Cape as though Cape had been found to be liable to Craig. If the district court determined that Charter had such responsibility, the parties agreed that Charter's liability would be $40,000. The parties also stipulated to many of the facts.
 
 
 4
 The following relevant facts are not disputed: Charter is a publicly held investment holding and finance company; Cape also is a publicly owned holding company. Both are incorporated under the laws of the United Kingdom and have their principal places of business in England. Through its subsidiaries, Cape engaged until 1979 in the mining of asbestos in South Africa and the distribution of that product to the industrial market. Between 1953 and 1978, Cape's wholly-owned subsidiary NAAC sold asbestos fiber in the United States.
 
 
 5
 Charter, through a subsidiary, acquired a 16% interest in Cape in 1965, which it expanded by gradual purchases and a 1969 tender offer until, by 1978, it held 67.3% of Cape's outstanding shares. From 1965 to 1969 Charter placed two of its own executives on Cape's Board of Directors. In 1969, after Charter acquired a majority of Cape's shares, Charter nominated a third director onto that Board, and has since that time, except for a brief period, maintained three directors on Cape's Board. During these years, Cape's Board consisted of between ten and fourteen directors. The majority were Cape employees, but there were two and sometimes three outside directors connected with neither Cape nor Charter. The managing director of Cape, originally R.H. Dent and later G.A. Higham, sat on the Board of Charter.
 
 
 6
 In 1973, Cape and its wholly-owned subsidiary NAAC were named as defendants in two asbestos injury suits filed in Texas. Cape unsuccessfully challenged jurisdiction. Ultimately, these cases were settled for $20 million, with Cape and NAAC responsible for $5.2 million. Thereafter, Cape declined to defend other asbestos litigation in the United States, permitting default judgments totaling $78 million to be entered against it.
 
 
 7
 NAAC was dissolved in 1978; in its place was formed the Continental Products Corporation (CPC), which ostensibly had no ties to Cape. However, Charles G. Morgan, NAAC's former president, was the president and sole shareholder of CPC, which had received its start-up funds through Cape's payment of "termination compensation" to Morgan. App. at 3617. CPC, which received its shipments of asbestos from Cape through a newly formed corporation in Liechtenstein, distributed asbestos to the former customers of NAAC in the United States for several years until terminating business in 1981. In 1979, Cape sold all of its asbestos mining and marketing subsidiaries to Transvaal Consolidated Land and Exploration Company Limited (TCL) with the agreement that Cape would indemnify TCL for asbestos-injury judgments in U.S. cases instituted within three years after the date of the sale only on condition that TCL continue Cape's policy of defaulting on judgments in the United States. As a result of these actions, Cape has apparently been able to avoid paying anything toward the injury claims of asbestos victims.
 
 III. The District Court Decision
 
 8
 The district court, after determining that New Jersey law should be used, applied a three-part test to determine whether the corporate veil of Charter should be pierced: the "plaintiff must demonstrate 1) control by one corporation of another, which is 2) used in a way that results in fraud or injustice; and which 3) is the proximate cause of plaintiff's alleged injury." App. at 3607 (citation omitted). The court concluded that under New Jersey law, actual fraud is not required and that it is sufficient if "the privilege inherent in incorporation is abused and a subsidiary used to perpetrate injustice." App. at 3610-11. The court then found that Cape's purposeful scheme to insulate itself from liability in the asbestos litigation by liquidating NAAC and at the same time continuing to take advantage of the United States market by distributing asbestos in this country through CPC "unquestionably" established the "fraud" or "injustice" factor. App. at 3619-20. The court also found that Cape's strategy of not appearing in the asbestos litigation was the proximate cause of the injury to either the plaintiffs Craig or the co-defendant LAQ.
 
 
 9
 The district court then addressed what it considered "the most difficult issue in this case," App. at 587, the issue of Charter's control over Cape. As the district court correctly noted, under New Jersey law the corporate veil of a parent corporation may not be pierced unless "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." State, Dep't of Environ. Protection v. Ventron Corp., 94 N.J. 473, 501, 468 A.2d 150, 164 (1983). Based on its findings of the facts regarding Charter's relationship with Cape, which we will discuss in depth below, the district court concluded that Charter's control of Cape was "actual, participatory and pervasive," and that "Cape functioned as an operational division of Charter and exercised no independent will of its own." App. at 3638. The district court therefore found Charter to be the alter ego of Cape and entered judgment holding Charter liable for Cape's tort obligation in the stipulated amount of $40,000. Charter appeals.
 
 IV. Standard of Review
 
 10
 LAQ argues that a district court's decision to pierce the corporate veil is so heavily fact-specific that it is subject to the "clearly erroneous" standard of review required by Fed.R.Civ.P. 52(a). Some courts have so held. See, e.g., United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 694 (5th Cir.1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986); Valley Finance, Inc. v. United States, 629 F.2d 162, 172 (D.C.Cir.1980), cert. denied, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981); DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 684 (4th Cir.1976).
 
 
 11
 We believe, however, that when a district court sitting in diversity applies state legal precepts to determine whether to pierce the corporate veil, the legal conclusion that it has drawn from the facts found is subject to plenary review. As we stated in Dent v. Cunningham, 786 F.2d 173, 175 (3d Cir.1986), when the issue is "the selection, interpretation, and application of legal precepts [the law of personal jurisdiction and New Jersey's conflict of law rules], review is plenary." See also In re McLinn, 739 F.2d 1395, 1403 (9th Cir.1984) (in banc) ("appellate review of conclusions of state law should be under the same independent de novo standard as conclusions of federal law.")
 
 
 12
 For example, we have held that we may exercise an "independent review" of a district court's determination that an individual possessed the requisite "apparent authority" to bind a corporation as its agent because, "[w]hen a finding is essentially one dealing with the effect of certain transactions or events, rather than a finding that resolves disputed facts, a reviewing court remains free to substitute its judgment for that of the trial court." D & G Equipment Co., Inc. v. First Nat'l Bank of Greencastle, Pa., 764 Fd.2d 950, 954 (3d Cir.1985); see also Greenfield v. Heublein, Inc., 742 F.2d 751, 758-59 (3d Cir.1984) (issue of whether a statement was "misleading" so as to constitute a violation of securities law involves review of the application of legal precepts and is subject to plenary review), cert. denied, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985). Thus, to the extent the district court resolved disputed facts, its findings are subject to the "clearly erroneous" standard, but to the extent the court determined the legal "effect of certain transactions or events," D & G, 764 F.2d at 954, that is, whether those events were sufficient under New Jersey law to warrant the application of alter ego liability, our review is plenary. See Poyner v. Lear Siegler, Inc., 542 F.2d 955, 959 (6th Cir.1976) (decision to disregard corporate separateness is subject to plenary review), cert. denied, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977).
 
 
 13
 Thus, our review of the district court's conclusion that the relationship between Charter and Cape satisfied the standard under New Jersey law for piercing the corporate veil is plenary.
 
 V. Discussion
 
 14
 A federal court sitting in diversity must apply the state substantive law as pronounced by the state's highest court, Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967), or, if there has been no such decision, must predict how the state's highest court would decide were it confronted with the problem. McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 661 (3d Cir.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). Fortunately for us in this case, we need not engage in the difficult problem of divining that which has not yet been spoken because the New Jersey Supreme Court has recently clearly and definitively set forth New Jersey law on piercing the corporate veil. See State, Dep't of Environ. Protection v. Ventron Corp., 94 N.J. at 499-501, 468 A.2d at 164-65 (1983).[2]
 
 
 15
 Ventron presented a situation comparable to that here because New Jersey's Department of Environmental Protection sought to impose liability on a parent corporation for the dumping of toxic wastes by its wholly-owned subsidiary. The New Jersey trial court, affirmed on this issue by the Appellate Division, had pierced the parent's corporate veil and held the parent liable for the pollution caused by the subsidiary. The New Jersey Supreme Court expressly disagreed with the reasoning of those courts. The court stated: "We begin with the fundamental propositions that a corporation is a separate entity from its shareholders, Lyon v. Barrett, 89 N.J. 294, 300 [445 A.2d 1153] (1982), and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." Ventron, 94 N.J. at 500, 468 A.2d at 164. It continued, "[e]ven in the case of a parent corporation and its wholly-owned subsidiary, limited liability normally will not be abrogated. Mueller v. Seaboard Commercial Corp., 5 N.J. 28, 34 [73 A.2d 905] (1950)." Id. It explained that the corporate veil may be pierced only where (1) "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent" and (2) "the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." Id. at 501, 468 A.2d at 164. New Jersey is thus in line with the approach taken generally on this issue. See 1 W. Fletcher, Cyclopedia of the Law of Private Corporations Sec. 43.10, at 490 (rev. perm. ed. 1983) (hereinafter cited as "Fletcher's ").
 
 
 16
 We accept for purposes of this appeal the district court's findings and conclusion that Cape's scheme to avoid asbestos-injury liability in the United States constituted the type of "fraud or injustice" that would satisfy that element of the standard for piercing the corporate veil. Although we therefore do not reach the legal issue of the type of fraud required, we appreciate the district court's sensitivity to the asbestos victim's lack of redress under a scenario whereby the seller of the injurious material (NAAC) is dissolved, its parent (Cape) suffers default judgments that may be uncollectible, and nevertheless the product from the same source continues to be sold and distributed in the United States. We comment merely that evasion of tort liability has never, in itself, been sufficient basis to disregard corporate separateness.
 
 
 17
 We turn instead to consider whether the evidence produced of record shows the type of control necessary to constitute Cape the alter ego of Charter. We reject at the outset LAQ's suggestion that the control test can be "diluted", and that "[a]ll that is required here is the injustice ... from the legal fiction of corporate separateness." Appellee's Brief at 43. Ventron makes clear that piercing the corporate veil "depends on" a finding of dominance. 94 N.J. at 501, 468 A.2d at 164. Only after there has been such a finding does one reach the fraud or injustice issue. Id.
 
 
 18
 The control which a parent must exercise over a subsidiary so as to warrant piercing the veil between them is more than "mere majority or complete stock control; " instead it is "complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." 1 Fletcher's, supra, Sec. 43, at 490. In another context, this court has listed some of the factors that must be considered to determine if the corporate veil should be pierced. These include:
 
 
 19
 gross undercapitalization ... 'failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.'
 
 
 20
 American Bell Inc. v. Federation of Telephone Workers, 736 F.2d 879, 886 (3d Cir.1984) (quoting Dewitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 686-87 (4th Cir.1976)); see also Phoenix Canada Oil Co. v. Texaco, Inc., 842 F.2d 1466 (3d Cir.1988) ("the concept of complete domination by the parent is decisive").
 
 
 21
 It is assumed to be the norm that a parent will have "not only ... the potential to exercise control [over the subsidiary], but to exercise it to a substantial degree." P. Blumberg, The Law of Corporate Groups: Tort, Contract, and Other Common Law Problems in the Substantive Law of Parent and Subsidiary Corporations Sec. 10.02, at 187 (1987). It is patently clear since Ventron that in New Jersey even the exercise of significant control by the parent over the subsidiary will not suffice to pierce the corporate veil. The relationship between the parent and subsidiary in Ventron was that Velsicol owned 100% of the Wood Ridge stock, all directors of Wood Ridge were officers of Velsicol, and the Wood Ridge board of directors met monthly in the Velsicol offices in Chicago. "At the meetings, the board not only reviewed financial statements, products development, and public relations, but also the details of the daily operations of Wood Ridge. For example, the Wood Ridge board considered in detail personnel practices, sales efforts, and production. Velsicol arranged for insurance coverage, accounting, and credit approvals for Wood Ridge." 94 N.J. at 484, 468 A.2d at 155.
 
 
 22
 Based on these facts, the New Jersey Supreme Court found that the record supported the lower court's conclusion that the "Velsicol [the parent corporation] personnel, directors and officers were constantly involved in the day-to-day operations of the business of [Wood Ridge] [the subsidiary]." Id. Nonetheless, the Supreme Court held "those conclusions are not sufficient to support the further conclusion that the intrusion of Velsicol into Wood Ridge's affairs reached the point of dominance." Id. at 501, 468 A.2d at 165. Because of both the lack of the requisite "dominance" and because the Ventron court thought that the subsidiary had not been incorporated for an "unlawful purpose," the Court decided that the common-law doctrine of piercing the corporate veil was not applicable.[3] Id. at 501-02, 468 A.2d at 165.
 
 
 23
 It is against the standard established in the Ventron decision[4] that we must examine the conclusion of the district court that sufficient control was exercised by Charter over Cape to pierce the corporate veil under New Jersey law. The district court based its conclusion on findings of fact regarding Charter's publicly announced intentions in connection with its tender offer to "control" Cape and use it to expand Charter's industrial activities; on Charter's involvement in Cape's financial and management affairs; on the presence of three Charter nominees on Cape's Board; and on Charter's ownership of a majority of Cape's stock and its ability to exercise control through that ownership if it so wished.[5]
 
 
 24
 It is to be expected that a corporation seeking to acquire majority ownership of another will seek to achieve control. Thus, Charter's statements upon which the district court relied, including particularly the statement that Charter "takes direct management responsibility for mining operations, both in the U.K. and overseas," App. at 3626, when viewed in the context of a takeover bid, do not add to the inquiry of how it exercised the control it eventually achieved. Indeed, R.H. Dent, the Chairman of Cape who had opposed the takeover, remained in that position for 10 years following the acquisition.
 
 
 25
 The district court also relied on its finding of "much evidence of Charter's widespread involvement in Cape's financial and management decisions." App. at 3627. The court looked to the evidence that Charter had promised to give Cape "strong financial backing," App. at 3627, Cape "routinely consulted Charter on 'financial decisions of a major character,' " id., Charter arranged financing for various Cape projects, and Cape agreed to discuss its dividend recommendations with Charter before they were presented to Cape's Board. In addition, a Charter statement revealed its plan to "maintain ... close scrutiny of new capital expenditure projects," App. at 1218; a letter from the Chairman of Cape to the head of Charter confirmed a meeting at Charter, subsequently held, to discuss the "future executive structure of Cape," App. at 1232; Charter on at least one occasion expressed displeasure to the Cape Board when the Cape Board decided to make an acquisition without consulting Charter; Cape subsequently agreed that it would consider "Charter's policy towards the size of its shareholding in Cape" when making future acquisition decisions, App. at 1257, 1636; the Chairman of Cape, R.H. Dent, who also sat on Charter's Board, regularly reported to Charter on Cape's financial results; and Dent sought to discuss with Charter his remaining as Chairman of Cape beyond the age of 60.
 
 
 26
 The involvement in Cape's financial and managerial affairs fails to rise to the high standard of domination necessary to pierce the corporate veil set out in Ventron. There, although the parent was "constantly involved in the day-to-day business" of its subsidiary, the Court held that the control over the subsidiary had not reached the required "point of dominance." 94 N.J. at 501, 468 A.2d at 165 (emphasis added). In this case, there is no evidence that Charter's intrusion into Cape's affairs is even "constant" or day-to-day. Moreover, and significantly, the district court found that "[t]he two corporate groups each maintained separate books, records, bank accounts, offices and staff; each consulted their own financial advisors, accountants and stockbrokers." Id. at 3626-27. See Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1162 (5th Cir.1983) (court refuses to pierce corporate veil when presented with "nothing more nefarious than the interest and involvement that properly may be demonstrated by an active parent corporation.")
 
 
 27
 The district court concluded that Charter's majority share of stock ownership gave it an "omnipresence in the minds of the Cape Board members" such that Cape was nothing more than an "operating division" of Charter. App. at 3634. However, potential control is not enough. See Scalise v. Beech Aircraft Corp., 276 F.Supp. 58, 62 (E.D.Pa.1967) ("although stock ownership and identity of officers and directors naturally subject the subsidiary to a measure of control, the issue ... is how such control is exercised"). Moreover, if the actual control exercised in Ventron was insufficient, the mere power to control cannot be determinative.
 
 
 28
 In Ventron, the Supreme Court of New Jersey adhered to the traditional view of alter ego liability law. We are not free to take a different position. See Poyner v. Lear Siegler, Inc., 542 F.2d 955, 958 (6th Cir.1976), cert. denied, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977). We also note that, after the district court's decision in this case, the Superior Court of New Jersey held, applying Ventron, that Charter was not the alter ego of Cape. See In re Asbestos Litigation Venued in Middlesex County ("Manville Plantworker Cases"), No. L-37243-79 (N.J.Super.Ct.Law Div. July 10, 1987) (not approved for publication).[6] Although we are not bound by that decision, particularly since LAQ was not a party to that action, Manville represents an application by a New Jersey court of the Ventron principles and thus is instructive.
 
 VI. Conclusion
 
 29
 For the reasons set forth above, the judgment of the district court will be reversed, and the case remanded to the district court for entry of judgment in favor of Charter.
 
 
 
 *
 At the time of oral argument, Judge Cowen was sitting by designation as a district judge for the District of New Jersey. Prior to the filing of this opinion, Judge Cowen joined this court as a Circuit Judge
 
 
 [1]
 NAAC, Cape's subsidiary, had been dissolved as a corporation in 1978 and was dismissed from the Craigs' suit on the ground of "lack of capacity to be sued." Under the stipulation referred to in the text, the parties agreed to proceed as if Cape had been found to be the alter ego of its former subsidiary NAAC, which had directly supplied asbestos to Owens-Corning
 
 
 [2]
 In light of our disposition of the case we need not reach the issue of whether the district court correctly chose to apply New Jersey law as opposed to United Kingdom law. LAQ argued that New Jersey law should apply, and we accept that view in considering the case
 
 
 [3]
 In discussing the significance of the Ventron case, the district court here believed that it was the absence of fraud or injustice, not the absence of sufficient control by the parent over the subsidiary, that was determinative of the New Jersey Court's decision not to pierce the corporate veil. App. at 3622. In light of the explicit statement by the Ventron court that the parent's intrusion into the affairs of the subsidiary did not reach the point of dominance, we cannot agree. Both the elements of "control" and injustice were seen as essential to justify piercing the corporate veil in Ventron, and both were found to be lacking by the Court
 
 
 [4]
 LAQ seeks to discount the Ventron decision on the ground that the Court used New Jersey statutory law to hold the parent Velsicol liable for the clean-up costs. Since the unanimous New Jersey Supreme Court believed it was important to reject the corporate veil-piercing rationale employed by the New Jersey lower courts, we cannot dismiss that portion of its opinion as dictum. Even if it were, it would be indicative of that court's requirements for piercing the corporate veil and of how this case would be decided if it were before that court. Moreover, Ventron continues New Jersey's long tradition of requiring domination before the corporate veil will be pierced. See Mueller v. Seaboard Commercial Corp., 5 N.J. 28, 73 A.2d 905, 908 (1950) (veil pierced where corporation was "so organized and conducted as to make it a mere instrumentality."); Telis v. Telis, 132 N.J.Eq. 25, 26 A.2d 249, 251 (1942) (corporate veil pierced where "corporate creation was ... a mere sham, a mere subterfuge, a mere instrumentality employed for concealing the truth."); Kugler v. Koscot Interplanetary, Inc., 120 N.J.Super. 216, 293 A.2d 682, 701 (Ch.Div.1972) (veil pierced where majority stockholder "identified himself ... as completely and fully as one can" with the corporation.)
 
 
 [5]
 Although the district court stated that while "[t]he fraudulent or inequitable acts upon which LAQ bases its requests for relief are primarily those of Cape," App. at 3612, it also found, rejecting the credibility of the Charter witnesses, that the board members, including Charter's nominee directors, knew of Cape's scheme to avoid liability prior to the board meeting at which the decision to dissolve NAAC was formally adopted. Because we are accepting the district court's findings and conclusions of fraudulent conduct for purposes of this appeal, it is not necessary for us to decide if this is sufficient to tarnish Charter with Cape's fraud
 
 
 [6]
 For opinions not approved for publication, N.J.Ct.R. 1:36-3 provides that such opinions shall not "constitute precedent or be binding upon any court." The rule also precludes a court from citing such an opinion "[e]xcept to the extent required by res judicata, collateral estoppel, the single controversy doctrine or any other similar principle of law." Id. The New Jersey rules are, of course, binding only on the New Jersey courts, and we would be remiss in our duty to apply New Jersey law were we to ignore a New Jersey case where the relevant issue is identical