NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2296
_____

NORTH AMERICAN STEEL CONNECTION , INC.,
Appellant

v.

WATSON METAL PRODUCTS CORPORATION;
GARY OSTERMUELLER

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 08-cv-4247)
District Judge:  Hon. Dickinson R. Debevoise
_____

Submitted Under Third Circuit LAR 34.1(a)
March 5, 2013

Before:   SCIRICA, JORDAN, and ROTH, *Circuit Judges*.

(Filed: March 18, 2013)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

North American Steel Connection, Inc. ("NASCO") appeals a September 14, 2010

order granting summary judgment to defendant Gary Ostermueller and dismissing

NASCO's claims against him.  For the following reasons, we will affirm.

## I.  Background

NASCO is a Louisiana corporation engaged in the business of importing steel.  In August 2007, it formed a joint venture with Watson Metal Products Corporation ("Watson"), a New Jersey corporation that manufactured and marketed metal products, and a company called Eastgate Global Logistics ("Eastgate").[1]  The purpose of the joint venture, called "Worldwide Construction Products" ("WCP"), was to market and sell steel products imported by NASCO from India.  WCP was organized on or around August 3, 2007 as a limited liability company ("LLC") under Delaware law, but no formal contract memorializing the terms of the joint venture was executed at that time.  Rather, the companies established through informal emails and oral conversations that Watson, NASCO, and Eastgate would be the members of the LLC, with NASCO importing the steel products, Watson providing warehouse space and accounting services, and Eastgate managing the primary warehouse.  Watson also continued to operate as an independent company, separate from its role in WCP.  At the time the joint venture was established, Gary Ostermueller, a New Jersey citizen, was Watson's president and majority shareholder.

Soon after the joint venture began, accounting disagreements arose between NASCO and Watson.  In addition to disputes regarding the timing of payments and the use of WCP's inventory as collateral for Watson's credit lines, NASCO discovered that Watson had impermissibly intermingled WCP funds with "its own separate corporate

_____

[1] Eastgate is not a party to this litigation.

2

funds," and had then used those funds to pay its own corporate debts. (Appellant's Opening Br. at 6.) Calling the mistake "human error" (App. at 267), Watson fired the controller responsible for the intermingling, and, in February 2008, the company entered into an agreement with NASCO to repay the money it owed. Pursuant to that agreement, Watson was to pay $496,860 to NASCO in monthly installments of $50,000, with an interest rate of 1.2 percent per month.[2] Ostermueller signed the agreement on behalf of Watson, but he was not a party to it in his personal capacity.

At around the same time, the members of the LLC signed an agreement providing that Eastgate and Watson would withdraw from WCP, leaving NASCO as its sole member. After withdrawing, Watson continued to operate a warehouse for NASCO until July 2008, when NASCO terminated that arrangement. During that period, Watson made one $50,000 payment to NASCO and earned around $100,000 of credit toward its debt through commissions, but, due to increasing financial difficulties, it was unable to pay the remainder of the debt.[3]

On August 22, 2008, NASCO filed this action against Watson and Ostermueller, stating five claims for relief denominated as breach of contract, breach of fiduciary duty, fraudulent misrepresentation and equitable fraud, unjust enrichment, and goods sold and delivered. It seeks $646,339 in damages, which represents the amount Watson allegedly

---

[2] $331,362 of the total was from the intermingling of funds; the remainder was "based on debts incurred prior to the joint venture." (App. at 15.)

[3] Watson sold all of its assets to a Colorado company on May 9, 2009, and filed for bankruptcy on November 22, 2011.

still owes pursuant to the February 2008 agreement. It also requests punitive damages and attorney's fees.

NASCO and Ostermueller filed cross motions for summary judgment, with NASCO moving for partial summary judgment on Ostermueller's liability,[4] and Ostermueller seeking judgment on all of the claims against him. On September 14, 2010, the District Court denied NASCO's motion and granted Ostermueller's, concluding that there was no evidence to support his being personally liable. Although the claims against Watson are still pending,[5] the District Court certified as final the order granting summary judgment to Ostermueller, pursuant to Federal Rule of Civil Procedure 54(b). This timely appeal followed.

---

[4] More specifically, NASCO sought a determination of the amount of damages owed, and a further determination that Ostermueller was jointly and severally liable for Watson's debt.

[5] Because those claims are still pending, we dismissed NASCO's first appeal, filed on October 6, 2010, due to the absence of a final judgment. Once Watson entered bankruptcy proceedings, the case before the District Court was stayed, and both parties requested that the Court certify its judgment as final with respect to the claims against Ostermueller so that the issue of his personal liability could be resolved more promptly. *See* Fed. R. Civ. P. 54(b) (permitting the district court to enter a final judgment as to one party in an action involving multiple parties if that court "determines that there is no just reason for delay"); *see also Carter v. City of Phila.*, 181 F.3d 339, 343 (3d Cir. 1999) (explaining that an order under Rule 54(b) "may be final and immediately appealable … when the district court makes an express determination that there is no just cause for delay and expressly directs entry of final judgment").

## II.     Discussion[6]

NASCO offers three theories of how Ostermueller can be held personally liable for the damages it incurred through the failed joint venture.  First, it argues that circumstances justify piercing Watson's corporate veil and holding Ostermueller individually liable for all the corporation's debts and liabilities.  Second, it claims that Ostermueller is liable under a "participation theory" of liability because he was a corporate officer sufficiently involved in the corporation's commission of a tort.  Third, it asserts that Ostermueller was the "manager" of the LLC, and that he is therefore directly liable for breaching fiduciary duties he owed to NASCO.[7]  We address each of those arguments in turn.

---

[6] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the matter is between citizens of different states.  As described above, *see supra* note 5, the District Court entered a final judgment with respect to the claims against Ostermueller, as is permitted by Federal Rule of Civil Procedure 54(b), and so we have jurisdiction under 28 U.S.C. § 1291.  *Carter*, 181 F.3d at 343.  "We exercise plenary review over a District Court's grant of summary judgment." *Macfarlan v. Ivy Hill SNF, L.L.C.*, 675 F.3d 266, 271 (3d Cir. 2012). "Summary judgment is appropriate where the court is satisfied 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Although the moving party bears the burden of showing that no genuine issue of fact exists, when that party does not bear the burden of proof at trial, it may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325.

[7] NASCO does not argue that Ostermueller is directly liable for breach of contract, unjust enrichment, or goods sold and delivered, instead basing those claims against Ostermueller solely on its piercing of the corporate veil theory.  To the extent that NASCO seeks to hold Ostermueller directly liable for his commission of "equitable fraud" (*see* Appellant's Opening Br. at 15-16 ("[O]f crucial importance to Ostermueller's

5

*A.	Piercing of the Corporate Veil*

New Jersey law[8] adheres to "the fundamental propositions that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *Richard A. Pulaski Const. Co. v. Air Frame Hangars, Inc.*, 950 A.2d 868, 877 (N.J. 2008) (quoting *State Dept. of Envtl. Prot. v. Ventron Corp.*, 468 A.2d 150, 164 (N.J. 1983) (internal quotation marks omitted)).  In order for a court to "pierce the corporate veil" and hold a shareholder personally liable for a corporation's liabilities, two conditions must be met: first, "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and second, "adherence to the fiction

individual liability" is that his involvement in the intermingling of Watson's and WCP's funds is "sufficient to constitute equitable fraud on his part"), that claim fails because NASCO does not seek any equitable remedies.  *See Jewish Ctr. of Sussex County v. Whale*, 432 A.2d 521, 524 (N.J. 1981) (allowing plaintiff to meet the "lesser burden" of equitable fraud because it sought "only equitable remedies"); *see also Foont-Freedenfeld Corp. v. Electro-Protective Corp.*, 314 A.2d 69, 71 (N.J. Super. Ct. App. Div. 1973) ("[I]n an action in which plaintiff relies upon equitable fraud, the only relief that may be sought is equitable relief, such as rescission or reformation of an agreement, and not monetary damages only.").

[8]	Both parties seem to agree that New Jersey law governs their dispute, as that is the only law they cite to in their briefing.  That approach comports with New Jersey choice-of-law principles, which instruct courts to apply the law of the state that has the "most significant relationship" to the occurrence giving rise to the dispute. *Fu v. Fu*, 733 A.2d 1133, 1138 (N.J. 1999) (applying the Second Restatement of Conflict of Laws approach to choice-of-law questions); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that in diversity cases, federal courts must apply the forum state's choice-of-law rules).  Here, Watson's principal place of business is New Jersey and Ostermueller is a New Jersey resident, and so presumably their alleged contract violations and tortious conduct occurred in that state, and that state's law should apply.

of separate corporate existence would sanction a fraud or promote injustice."[9] *State*

*Capital Title & Abstract Co. v. Pappas Bus. Servs.*, 646 F. Supp. 2d 668, 679 (D.N.J.

2009) (internal quotation marks omitted).  In other words, the corporation must be the

"alter ego" of the shareholder, such that the corporate form is effectively a legal fiction,

and enforcing that legal fiction must result in some fundamental unfairness.  *Verni ex rel.*

*Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 497-99 (N.J. Super. Ct. App. Div.

2006).  The party seeking to pierce the veil bears the burden of proving that those

---

[9] NASCO tries to focus our attention solely on the second prong of that two-part test, arguing that a finding of "equitable fraud" is sufficient to pierce the corporate veil. (Appellant's Opening Br. at 11.)  As the District Court correctly noted, however, that contention is based on a single line, taken out of context, in *Walensky v. Jonathan Royce International, Inc.*, 624 A.2d 613, 617 (N.J. Super. Ct. App. Div. 1993), which reads, "in a court of equity, all that is required to justify the piercing of a corporate veil is 'equitable fraud.'"  When read in light of the rest of the opinion, that statement seems to suggest that equitable fraud, as opposed to legal fraud, can satisfy the second prong of the test, not that the first prong can be disregarded whenever there is an allegation of equitable fraud. *See Walensky*, 624 A.2d at 617 (recognizing at the outset of the analysis that the shareholder "was using [the corporation] as his 'alter ego' and thus, was abusing the corporate form in order to advance his own personal interests").  Moreover, the New Jersey Supreme Court is the final authority on the state's substantive law, *see Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir. 1988) ("A federal court sitting in diversity must apply the state substantive law as pronounced by the state's highest court … ."), and it has clearly and repeatedly required a finding of "corporate dominance" by a parent corporation or other dominant shareholder, prior to piercing the corporate veil, *id.* at 150 (concluding that New Jersey Supreme Court precedent "makes clear that piercing the corporate veil depends on a finding of dominance" and "[o]nly after there has been such a finding does one reach the fraud or injustice issue" (internal quotation marks omitted)); *see also Richard A. Pulaski Const. Co.*, 950 A.2d at 877-78; *Ventron*, 468 A.2d at 164.  NASCO's claim that we need not engage in the "corporate dominance" or "alter ego" analysis is therefore without merit.  Equally unavailing is NASCO's argument that the corporate veil should be pierced because, due to Watson's bankrupt status, NASCO will otherwise be deprived of a remedy.  There is no authority suggesting that we can disregard New Jersey's requirements for piercing the corporate veil whenever a plaintiff might otherwise be unable to recover for an alleged wrong.

circumstances are present, *Richard A. Pulaski Const. Co.*, 950 A.2d at 877-78, a burden

that "is notoriously difficult for plaintiffs to meet," *Pearson v. Component Tech. Corp.*,

247 F.3d 471, 485 (3d Cir. 2001).

In *Craig v. Lake Asbestos of Quebec, Ltd.*, we discussed at length the factors New

Jersey courts use to determine whether corporate separateness is effectively a "legal

fiction." 843 F.2d 145, 150 (3d Cir. 1988). Emphasizing that simply being a majority

stockholder or having "the potential to exercise control" is insufficient, we concluded that

satisfying the first prong of the veil-piercing analysis requires "complete domination, not

only of finances but of policy and business practice," such that the corporate entity has

"no separate mind, will or existence of its own." *Id.* (internal quotation marks omitted).

Factors demonstrating that level of dominance include:

> gross undercapitalization … failure to observe corporate
> formalities, non-payment of dividends, the insolvency of the
> debtor corporation at the time, siphoning of funds of the
> corporation by the dominant stockholder, non-functioning of
> other officers or directors, absence of corporate records, and
> the fact that the corporation is merely a facade for the
> operations of the dominant stockholder or stockholders.

*Id.* (internal quotation marks omitted). As those factors indicate, the veil-piercing inquiry

is focused not simply on an individual shareholder's level of personal involvement with a

corporation, but rather on whether the corporate form itself is a sham. *Cf. Pappas*, 646 F.

Supp. 2d at 680 (explaining that in a closely held corporation "one member must

dominate the corporate entity if the business is to function and be profitable," but that fact

does not mean the corporation is "a sham corporate entity set up to … evade personal

liability").

8

NASCO points to only one piece of evidence that it argues indicates that Ostermueller and Watson lacked "separate personalities" (Appellant's Opening Br. at 17): a personal loan that Ostermueller obtained to help satisfy Watson's corporate debt.[10] According to NASCO, "Ostermueller's willingness to combine personal and corporate assets [is] an indication that he saw no difference between the two," and such an inference could support a jury finding that his and Watson's separate identities had "blurr[ed]." (Appellant's Opening Br. at 17-18.) As the case law makes clear, however, even if we were to agree that Ostermueller's personal loan constituted a "blurring" of his and Watson's identities (*id.* at 17), that fact is insufficient to justify piercing the corporate veil; rather, Ostermueller must have dominated Watson to such a degree that the corporation had "no separate mind, will or existence of its own." *Craig*, 843 F.2d at 150. NASCO has not provided any evidence of such dominance. It does not allege that Watson failed to observe the corporate formalities, much less that Ostermueller was using the corporation as a façade for his personal operations. *See id.* (identifying those factors as indications of corporate dominance). In fact, taking out a personal loan for the benefit of the corporation is the opposite of "siphoning of funds of the corporation by the

---

[10] NASCO referenced two more items in its argument before the District Court: Ostermueller's request "to pledge joint venture inventory as collateral for a Watson line of credit" and his "use[] [of] personal pronouns" when referring to his role in the joint venture. (App. at 22.) It does not mention that evidence in its argument on appeal, however, and thus has waived any claim that those facts demonstrate corporate dominance. *See United States v. DeMichael,* 461 F.3d 414, 417 (3d Cir. 2006) ("An issue is waived unless a party raises it in its opening brief … ."). In any event, the District Court correctly concluded that that evidence "is not enough to show that [Ostermueller] was using Watson as his alter ego." (App. at 23.)

9

dominant stockholder," which is the type of evidence typically used to justify disregarding the corporate form. *Id.*

B.   *Participation Theory of Liability*

NASCO next argues that even if the corporate veil between Watson and Ostermueller cannot be pierced, Ostermueller is directly liable to NASCO based on a "participation theory" of liability. Under that theory, "a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort." *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 272 (N.J. 2002). There are three distinct elements that a plaintiff must establish to succeed under the participation theory: (1) "the corporation owed a duty of care to the victim"; (2) that duty "was delegated to the officer"; and (3) "the officer breached the

---

[11] NASCO's emphasis on "the heightened fiduciary duties that exist between parties to a joint venture" is irrelevant to the veil-piercing analysis. (Appellant's Opening Br. at 1.) The duties that Watson and Ostermueller may have owed to NASCO are unrelated to whether Watson was Ostermueller's "alter ego," and thus they cannot serve as a basis to pierce the corporate veil. *See Verni*, 903 A.2d at 498 (describing the "alter ego" doctrine). As the District Court accurately explained, "NASCO cannot use the joint venture theory as an end-run around the burdens imposed on a party seeking to disregard the corporate form." (App. at 27.)

[12] Because we conclude that there is no evidence supporting a finding of corporate dominance, we do not reach the second prong of the analysis – whether failing to pierce the veil would result in fraud or injustice. *Ventron*, 468 A.2d at 164; *see also Craig*, 843 F.2d at 150 ("Only after there has been [a finding of corporate dominance] does one reach the fraud or injustice issue.").

10

duty of care by his own conduct." *Id.* NASCO claims that Ostermueller is directly responsible for Watson's intermingling of the funds of the joint venture, and thus, as Watson's corporate officer, could be found liable under the participation theory.

NASCO's argument fails because it has not alleged any actual culpability on the part of Ostermueller in the intermingling of funds. Even if the intermingling were tortious (a point on which we express no opinion), Ostermueller's only involvement with it was that his responsibilities as president of Watson allegedly included "mak[ing] sure that [the controller] keeps proper track of money." (Appellant's Opening Br. at 21.) NASCO does not provide any evidence that Ostermueller directed the intermingling, that he condoned it, or that he negligently supervised the controller. Rather, NASCO claims that Ostermueller's status as a supervisor is itself sufficient to establish his participation in a corporate tort, effectively arguing that corporate officers are personally liable for all torts that occur on their watch. That argument ignores the element of the participation theory requiring that the corporation's breach occurred "by [the officer's] own conduct," *Saltiel*, 788 A.2d at 272, and it is plainly contradicted by the principle of New Jersey law that "[a] director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character," *Sensale v. Applikon Dyeing & Printing Corp.*, 79 A.2d 316, 317-18 (N.J. Super. Ct. App. Div. 1951). Therefore, no reasonable jury could find that Ostermueller was "sufficiently involved" in the intermingling of funds to be held personally liable for it, *Saltiel*, 788 A.2d at 272, and the District Court properly rejected that claim.

## C. Breach of Fiduciary Duties

Finally, NASCO argues that Ostermueller breached his fiduciary duties to NASCO, and should, one way or another,[13] be held personally liable for that breach. Specifically, NASCO maintains that Ostermueller was the "manager" of WCP (Appellant's Opening Br. at 3), and that he thus owed the participants in the joint venture a "heightened" fiduciary duty (*id.* at 1), which he breached by allowing the intermingling of the LLC's funds with Watson's.

As the District Court rightly observed, that argument fails because there is no evidence that Ostermueller was in fact the manager of WCP. The manager of an LLC is not simply a person who assumes management responsibilities. Rather, under Delaware law, the "manager" must have been "named as a manager … in a limited liability company agreement or similar instrument under which the limited liability company is formed." Del. Code Ann. tit. 6, § 18-101(10).[14] Once so designated, the manager "has the authority to bind the limited liability company," *id.* § 18-402, and thus owes "traditional fiduciary duties of loyalty and care to the members of the LLC, unless the

---

[13] NASCO's argument on this point is rather unclear. Its primary claim seems to be that Ostermueller's alleged breach of fiduciary duties is itself a basis for piercing Watson's corporate veil, which, as we have explained, ignores New Jersey's requirements for veil-piercing, *see supra* note 11. NASCO also asserts more generally that Ostermueller should be directly liable for the breach of a duty it says that he owed to NASCO as "manager" of the joint venture. (Appellant's Opening Br. at 1-2, 20.) The latter argument is the one we address here.

[14] Although New Jersey law governs NASCO's claims generally, *see supra* note 8, Delaware law governs the internal affairs of a Delaware entity. *Cf. Fagin v. Gilmartin*, 432 F.3d 276, 282 (3d Cir. 2005) ("Under New Jersey's choice-of-law rules, the law of the state of incorporation governs internal corporate affairs.").

parties expressly modify or eliminate those duties in the operating agreement," *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011).

NASCO points to only two instances in which Ostermueller was referred to as the "manager" of WCP: an email in which he offered to "resign as manager," and a reference in his affidavit to being the "manager."[15] (Appellant's Opening Br. at 5; *see also* App. at 299, 346.) Under Delaware law, Ostermueller could not have unilaterally established himself as manager of the LLC through such statements. *See* Del. Code Ann. tit. 6, § 18-101(10) (defining a manager as a person so designated in an LLC agreement). NASCO has presented no evidence that the members of the LLC agreed that he would occupy that position, or that he in fact exercised management authority. Because of that lack of evidence, no reasonable jury could find that he was in a fiduciary relationship with NASCO, much less that he is liable for breach of a fiduciary duty. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006) ("[A] fiduciary relationship is a

---

[15] NASCO's focus on a clause from the withdrawal agreement is misplaced. The clause reads:

> Effective January 1, 2008, Gary E. Ostermueller, President of Watson, on behalf of Watson, resigns as the Managing Member of [WCP] and Watson withdraws as a Member of [WCP].

(App. at 343; *see also* Appellant's Opening Br. at 5.) To the extent that that passage is ambiguous as to whether Ostermueller or Watson was the "managing member," that ambiguity is clarified by the preceding clauses in the contract, which explain that Watson, Eastgate, and NASCO are the founding members of the LLC, and that Waston and Eastgate are withdrawing, leaving NASCO as the sole remaining member. Moreover, NASCO does not claim that Ostermueller was a member of the LLC, which would be required in order for him to have been the managing member. Although the manager of an LLC need not be a member, Del. Code Ann. tit. 6, § 18-402, the cited clause says nothing about Ostermueller's role as manager, and thus is irrelevant to that inquiry.

13

situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another." (internal quotation marks omitted)).  The District Court therefore did not err in granting summary judgment to Ostermueller on that claim.

III.    **Conclusion**

For the foregoing reasons, we will affirm the District Court's grant of summary judgment to Ostermueller on all of the claims against him.