William R. LLOYD Jr. Small Business
Advocate, Petitioner

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 6, 2010.

Decided March 1, 2011.

Steven C. Gray, Harrisburg, for petitioner.

Heidi L. Wushinkse, Harrisburg, for respondent.

Christopher A. Lewis and Christopher R. Sharp, Philadelphia, for intervenor United Telephone Company of Pennsylvania.

BEFORE: McGINLEY, Judge, and LEAVITT, Judge, and BROBSON, Judge.

OPINION BY Judge BROBSON.

Petitioner William Lloyd, Small Business Advocate (SBA), petitions for review of two orders of the Pennsylvania Public Utility Commission (PUC). The PUC's first order approved the joint application of Embarq Pennsylvania (Embarq PA), now known as The United Telephone Company of Pennsylvania d/b/a CenturyLink,[1] and Embarq Communications [2,3] (collectively either Embarq, Joint Applicants, or the companies, as pertinent) for the indirect transfer of control of the Joint Applicants to CenturyTel (to which the PUC referred collectively as the Merging Parties). The PUC issued its approval subject to the companies' acceptance by Embarq's officers of certain conditions. One of the conditions was that the PUC reserved the right to issue a subsequent order, incorporating additional conditions that the Federal Communications Commission (FCC) might impose in its consideration of a concurrent transfer application by the companies. In accordance with the conditional language of its initial order, the PUC issued a second order, which modified the initial order by incorporating merger conditions that the FCC imposed in its order resolving the transfer request. SBA also petitions for review of this latter order.

## I. Factual and Procedural Background

The companies submitted their Joint Application in November 2008. The PUC published notice of the proposal and assigned the matter to Administrative Law Judge Wayne Weismandel (ALJ). The ALJ held a hearing on March 3, 2009.

The facts as revealed in the record and the ALJ's Initial Decision and PUC's Opinion and Order are summarized below.

---

1. Embarq PA has a certificate of public convenience as a certified incumbent local exchange carrier (ILEC).

2. Embarq Communications has a certificate of public convenience as an interexchange toll reseller.

3. Embarq Corporation is the parent company of Embarq PA and Embarq Communications. Embarq Corporation has subsidiaries that offer communication services to business and residential customers including local and long-distance telephone service, high speed data transmission, wireless, and video services.

Embarq PA, as noted above, is an ILEC.[4] Embarq PA's certificate of public convenience authorizes it to provide local exchange services in ninety-two exchanges in all or part of twenty-five counties in Pennsylvania. Embarq PA serves approximately 326,078 access lines in Pennsylvania. Embarq Communications is an interexchange toll reseller,[5] and it has approximately 160,000 customers in Pennsylvania. Embarq, CenturyTel, and CenturyTel's newly created and wholly-owned subsidiary Cajun Acquisition Company (CAC), entered into an agreement and plan of merger (Merger Agreement), under which the parent company, Embarq Corporation, would merge with CAC. CAC would then cease to exist and Embarq would survive, adopting CAC's By–Laws and Certificate of Incorporation. The stock-for-stock transaction effectuating the merger would result in Embarq becoming a direct, wholly-owned subsidiary of CenturyTel.

On April 3, 2009, the ALJ issued a decision in which he recommended to the PUC approval of the Joint Application without conditions. The ALJ rendered numerous factual findings relating to CenturyTel's experience and practices in the telecommunications market. The ALJ determined that CenturyTel had acquired and integrated many access lines, enabling it to serve approximately 2.1 million access lines and 600,000 broadband connections. CenturyTel, the ALJ determined, had a managerial organization with developed and tested acquisition skills and a highly-skilled technical staff. The ALJ found that CenturyTel has extensive experience with the integration of acquired access lines and that CenturyTel has a similar degree of experience in converting large numbers of customers to new systems, with a sophisticated system of customer support that ensures effective operations.

The ALJ concluded that the merger reflected the combination of similar entities (both focusing on the ownership and operation of subsidiary ILECs in predominantly rural areas in multiple states) with complimentary cultures. The ALJ's factual findings observed the significant impact of "intense" intermodal competition[6] on traditional ILECs such as Embarq PA.[7] CenturyTel, in contrast, based upon its more rural service area, has fewer switched lines (and expected lower rates of line loss), resulting in less financial pressure on that company. The ALJ also determined that while Embarq experienced a decline in revenue, the merger would result in "more modest levels of revenue declines than at Embarq alone." (ALJ

4. ILECs were established by virtue of the Federal Telecommunications Act of 1996, 47 U.S.C. §§ 160–614, that resulted in the break-up of AT & T into "Baby Bells." ILECs are the local exchange carriers associated with specific geographical areas that, at the time of the break-up, consisted of regional Bell operating companies or other independent local exchange carriers. ILECs compete with other local exchange carriers that entered the particular local market after the AT & T break-up, and such competitors are known as competitive local exchange carriers, or CLECs.

5. Interexchange toll (or long-distance) resellers provide long-distance phone service between local exchange carriers and local access transport area (represented by area codes) providers of long distance service. These entities do not own their own network, but lease bulk capacity and resell portions at a higher rate.

6. Intermodal competition includes, for example, wireless telecommunications providers.

7. The ALJ noted, in particular, that although CLECs have not been a significant factor in Embarq PA's territory, the company has lost nearly one-third of its retail access lines since 2001.

Initial Decision, Finding of Fact (F.F.) No. 46, attached to SBA's definitive brief.) "[T]he combined entity will have less exposure to access line loss and competitive pressures." (*Id.*, F.F. No. 47.) The combination of assets, resources, and complementary strengths resulting from the merger would enable the new company to "achieve greater economies of scale and scope" than the two companies would experience independently. (*Id.*, F.F. No. 50.)

A key subject of the ALJ's decision related to the "synergy" savings (estimated to reach $400 million annually) that the merged company could anticipate.[8] Merger, the ALJ determined, would likely result in the following beneficial outcomes for the new company: (1) a better credit rating; (2) a higher investment grade rating; (3) access to capital for strategic investment opportunities; (4) positive bond market views; (5) greater access to both equity and debt capital; (6) a dividend payout ratio that will permit an appropriate balance between debt and equity to be maintained; (7) increased financial strength, which will "provide a better basis for engaging in intermodal competition." (*Id.*, F.F. No. 62). The merger would result in a benefit to Pennsylvania customers by, among other things, (1) enhancing the ability to bring emerging technologies and resulting advanced services to Pennsylvania customers; (2) pooling the expertise of Embarq and CenturyTel to better serve the needs of customers; (3) improvement through the use of best practices; and (4) using CenturyTel's customer-fo-

cused billing and customer care systems. (*Id.*, F.F. Nos. 65, 67, 69, and 70.)

Ultimately, the ALJ approved the merger without conditions. SBA filed exceptions to the ALJ's order, suggesting that a single condition be incorporated into the decision relating to the use of synergy savings. On May 28, 2009, the PUC issued its first order,[9] adopting the ALJ's decision, but adding conditions to the ALJ's order, including the right to amend its order based upon conditions the FCC might later place on the merger. The PUC rejected the condition suggested by SBA. A key factor in the PUC's adoption of the ALJ's decision was the determination that the merger would make the companies financially stronger and better able to compete in the intermodal marketplace.

SBA filed a timely petition for review of the PUC's order, asking this Court to remand the matter to the PUC to reconsider its analysis regarding the effect of "synergy savings." On August 31, 2009, the PUC filed an application with this Court for an order remanding the case to the PUC to modify its order in light of the issuance by the FCC of an order approving the merger. This Court granted the application and remanded the case to the PUC for the PUC's consideration of "safeguards and conditions" included in the FCC's order. Following the PUC's issuance of a tentative order and SBA's submission of comments in response to the tentative order, the PUC issued a final order and opinion on March 1, 2010. In that final order, the PUC rejected SBA's recommendations and incorporated the conditions adopted by the FCC in its or-

---

8. "The combined companies expect to realize enhanced cash flows through operating efficiencies as well as revenue opportunities achieved through improved focus on services such as broadband and reduced losses of local customers." (ALJ Initial Decision, F.F. No. 51.)

9. The PUC noted that it incorporated the ALJ's factual findings and legal conclusions, except where expressly or impliedly rejected or modified in its decision.

der. SBA filed a petition for review of that March 1, 2010 order, which is now before this Court.

SBA appealed the PUC's orders raising the following single issue: "May the PUC consider the strengthening of Embarq PA as a competitor to be a detriment when the PUC is determining whether the proposed transfer of control will result in substantial affirmative public benefits?"[10]

## III. Analysis

■■■ This Court's standard of review of a decision of the PUC is limited to considering whether substantial evidence supports necessary factual findings, whether the PUC erred as a matter of law, and whether any constitutional rights were violated. 2 Pa.C.S. § 704; *PECO Energy Co. v. Pub. Util. Comm'n*, 568 Pa. 39, 46, 791 A.2d 1155, 1160 (2002). The PUC is the ultimate finder of fact in matters involving certificates of public convenience. *Kviatkovsky v. Pub. Util. Comm'n*, 152 Pa. Cmwlth. 291, 618 A.2d 1209 (1992). We hasten to point out that courts should defer to the PUC's interpretations of the Code and its own regulations unless the PUC's interpretations are clearly erroneous. *Popowsky v. Pa. Pub. Util. Comm'n*, 550 Pa. 449, 462, 706 A.2d 1197, 1203 (1997). This Court may not "substitute its judgment for that of the PUC when substantial evidence supports the PUC's decision on a matter within the commission's expertise." *Id.* at 457, 706 A.2d at 1201. "Judicial deference is even more necessary when the statutory scheme is technically complex." *Id.* at 462, 706 A.2d at 1203.

The statutory authority for mergers of public utilities is found in Section 1102(a) of the Public Utility Code (Code), 66 Pa. C.S. § 1102(a), which states:

> (a) Upon the application of any public utility and the approval of such application by the [PUC] ... and upon compliance with existing laws, it shall be lawful:
>
> ...
>
> (3) For any public utility or an affiliated interest of a public utility ... to acquire from, or to transfer to, any person or corporation ... by any method ... including a ... merger ... any tangible or intangible property used or useful in the public service.

■■ In order to operate as a public utility, companies seeking to merge must obtain a certificate of public convenience. Section 1103(a) of the Code, 66 Pa.C.S. § 1103(a), provides the overarching requirement for an entity seeking a certificate of public convenience:

> A certificate of public convenience shall be granted by order of the [PUC], only if the [PUC] shall find or determine that the granting of such certificate is necessary or proper for the service, convenience, or safety of the public.

In reviewing an application for approval of a merger, the PUC may only grant such a certificate of public convenience if it makes a factual determination in accord with Section 1103(a) that the merger will provide an affirmative benefit to the public. *City of York v. Pa. Pub. Util. Comm'n*, 449 Pa. 136, 295 A.2d 825 (1972).[11]

---

**10.** Although SBA requested only that the Court reverse the PUC's order and remand to the PUC with direction that it reweigh the potential advantages and detriments of the merger, SBA's brief also suggests that it would not object if the PUC were to grant the application if the PUC also incorporates the SBA's suggested condition to have the merged

company allocate some of the anticipated synergy savings in a manner that would directly benefit the ILEC's (formerly Embarq PA) ratepayers.

**11.** Before our Supreme Court issued its decision in *York*, the earlier decision of the Supreme Court in *Northern Pennsylvania Power*

More recently, however, our Supreme Court provided additional guidance for reviewing merger applications. In *Popowsky v. Public Utility Commission*, 594 Pa. 583, 937 A.2d 1040 (2007) (*Popowsky* ), the court evaluated an appeal by Verizon and MCI of this Court's decision reversing the PUC's approval of those companies' merger application. The Supreme Court summarized the analysis as follows:

[T]he appropriate legal framework requires a reviewing court to determine whether substantial evidence supports the [PUC]'s finding that a merger will affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way. In conducting the underlying inquiry, the [PUC] is not required to secure legally binding commitments or to quantify benefits where this may be impractical, burdensome, or impossible; rather, the PUC properly applies a preponderance of the evidence standard to make factually-based determinations (including predictive ones informed by expert judgment) concerning certification matters.

*Popowsky*, 594 Pa. at 611, 937 A.2d at 1057. With regard to the impact of anticompetitive consequences of a proposed merger, the Supreme Court opined as follows:

We also differ with the [Office of Consumer Advocate]'s suggestion that the PUC's analysis of the effect of the Verizon/MCI merger on competition is immaterial to its assessment of public benefit. In line with the [Department of Justice] and the FCC assessments, *competitive impact is a substantial component of a rational net public benefits evaluation* in the merger context. *That the ultimate determination may be that*

*the impact is modest, minimal, or non-existent does not negate the necessity of undertaking the examination in the first instance or remove the factor from the weighing and balancing process.* Significantly, in terms of the net public benefits arising out of corporate consolidation, *anticompetitive effects may offset or negate advantages* and result in a denial of regulatory approval. Indeed, it is for this very reason that large merger transactions are so highly regulated. Thus, in the present case, it is clear that *the [PUC]'s satisfaction that competition will not be impaired was a legitimate and significant factor in the overall certification inquiry.*

*Id.*, 594 Pa. at 610–11, 937 A.2d at 1056–57 (emphasis added).

■ Thus, *Popowsky* makes clear that the PUC must engage in an examination of the competitive effects of a proposed merger. Although *Popowsky* suggests that the effect of a merger on competition may be "modest, minimal, or non-existent," the Supreme Court also indicated that *anti-competitive* effects of a merger may offset or negate the advantages of a merger.

■ In this case, SBA's argument consists of two primary components: (1) in engaging in the balancing of benefits and detriments resulting from approval of the merger, the PUC improperly concluded that financial strengthening and the consequential potential to enhance Embarq's ability to compete constituted positive public benefits of the merger; and (2) the result of the merger will be the strengthening of an ILEC, which will erect barriers to CLECs' abilities to compete (and thus is anti-competitive).

---

*Company v. Public Utility Commission*, 333 Pa. 265, 5 A.2d 133 (1939), had provided a different standard, whereby a utility proposing a merger needed to demonstrate only that the merger would not adversely affect the public.

We begin by pointing out that the benefits to the merged company that the ALJ and the PUC observed, such as better credit rating, access to capital for investment opportunities, greater access to equity and debt capital, and, most notably, increased financial strength, are benefits that are common to mergers in general. Certainly, no one could dispute that companies would be less inclined to merge if the companies themselves did not stand to benefit from the transaction. We do not, however, perceive the PUC's decision as holding that the benefits of the merger *to the merging companies* are the affirmative public benefits that merging companies must demonstrate in order for the PUC to issue a certificate of public convenience.

While the ALJ made factual determinations regarding the anticipated benefits to the companies' financial position following merger, the ALJ and the PUC regarded these company benefits as not simply providing an opportunity for increased financial strength, but rather, as a means of accomplishing affirmative public benefits as required under Section 1103(a) of the Code.

In *Popowsky,* as in this case, a consumer advocate (the Office of Consumer Advocate) sought to challenge the perceived proposition that the strengthening of the merged companies as a competitor necessarily would result in benefits to the public. *Id.,* 594 Pa. at 592, 937 A.2d at 1045.[12] Here, as in *Popowsky,* in addition to rendering factual findings regarding the manner in which the merged company would itself benefit, the ALJ made factual determinations regarding the assets and strengths that each company is bringing to

the table and the expected benefits to the public that will result from the alteration in corporate structure as well as the financial strengthening of the company. The PUC quoted and adopted the ALJ's summary of the inter-relationship between the improved financial condition of the merged companies and the anticipated affirmative public benefits of the merger:

CenturyTel and Embarq, as stand-alone companies were industry-leading telecommunications providers in terms of their size, services, balance sheets and access to capital, but this combination makes them more capable of coping with revolutionary and remarkable new market conditions. The strengthening of the operating characteristics and credit profile of Embarq through the proposed combination with CenturyTel will result in the company having greater access to both equity and debt capital that should provide the company with an enhanced ability to tap-reasonably-priced external capital sources, to the extent necessary, to fund ongoing levels of high investment in infrastructure and services. This improved capital availability will provide Pennsylvania customers with the benefit of a truly advanced communications service provider.

. . .

The affirmative benefits arising from this transaction are not the immediacy of specific new products and services, but rather the creation of a combined company with strong resources—and therefore stronger access to capital markets—enhanced infrastructure, and increased operating efficiencies that substantially benefit the public interest in Pennsylvania in the long term.

---

12. The Court in *Popowsky* also noted that the merging companies relied upon the Supreme Court's approval in *City of York* of a merger "based upon substantial evidence that the merger would, inter alia, result in a stronger company, improve access to capital markets, provide comparative advantages, not adversely affect rates, and produce operating economies." *Popowsky,* 594 Pa. at 602–3, 937 A.2d at 1052.

(PUC Opinion at 13–14, quoting ALJ's Initial Decision at 24.) The PUC also recognized and accepted other affirmative public benefits of the merger that the ALJ identified, including: (1) the "pooling of employees, expertise and systems to serve the needs of predominantly rural customers;" (2) the use of CenturyTel's billing system for customers, which permits customer service representatives to view a customer's information in one place; and (3) increase of diversification, which would lower the risks of operation (PUC Opinion at 14–15); (5) "the development of core competencies in emerging technologies, such as 700 MHz wireless service and IPTV (internet protocol television), and the opportunity to connect in the future to CenturyTel's Lightcore fiber backbone network" (PUC Opinion at 12, quoting ALJ Initial Decision at 22), which will enable "the companies to bring advanced services to Pennsylvania at some point in the future" (ALJ Initial Decision at 25); and (6) commitment of the companies "to focusing on the advancement of products and services, including DSL, fiber-based data services, long-haul transport, and possibly video products in markets where the economics support deployment." (ALJ Initial Decision at 24.)

We do not believe that the ALJ and PUC erred in viewing these benefits arising as a result of the financial strengthening of the merged company in the "public benefits" analysis. As we observed above, in *Popowsky* our Supreme Court saw no error in the PUC's reference to such strengthening when that improvement in financial position is the catalyst for identified affirmative public benefits. In accordance with *Popowsky*, however, in addition to examining the expected public benefits, the PUC must also examine the competitive effects of a merger. As suggested above, common sense demonstrates that companies will not merge if a merger will result in a weakened financial condition. Intuitively, it is also reasonable to assume that the financial rewards that a merger may produce for a company have a relationship to a company's ability to compete with other similar entities in the same market.

In this case, SBA appears to assert that the PUC must, in all instances, engage in a balancing of the affirmative public benefits found in a proposed merger *against* every competitive effect of the merger, whether the effect is good, bad, or indifferent. In *Popowsky*, however, the Supreme Court did not take this approach. Rather, the Supreme Court instructed the PUC in all cases of merger, (1) to evaluate the competitive effects of the merger; and, (2) if the effects of the merger are *anti-competitive*, then the PUC must consider whether those *anti-competitive* effects outweigh or "negate" the affirmative public benefits it has identified. *Popowsky*, 594 Pa. at 610–11, 937 A.2d at 1056–57. If the PUC concludes that the *anti-competitive* effects outweigh the affirmative public benefits, then the PUC should not issue a certificate of public convenience. *Id.*

The Supreme Court in *Popowsky* also observed that, in some circumstances, the competitive effect of a merger will be modest, minimal, or non-existent. *Id.* In this case, as in *Popowsky*, the PUC found that the merger would have a *positive* effect on competition in Pennsylvania. In following the Supreme Court's guidance (where only *anti-competitive* consequences warrant a balancing of the negative competitive effects and affirmative benefits of a merger), in a case where the PUC finds not simply that the merger will have no effect on competition, but rather a positive effect, we cannot agree with the SBA that the PUC must regard the competitive impact as a detriment against which it must weigh affirmative public benefits.

Here, the PUC adopted the ALJ's factual findings, including the following:

Intermodal competition takes on many forms, including wireless providers and cable companies as well as CLECs (both resellers and facilities based). Intermodal competition continually forces ILECs, like Embarq, to rethink business strategies. The proposed merger of CenturyTel and Embarq is a direct result of the need for both companies to create greater financial stability to provide reliable and innovative services in the intermodal competitive marketplace.

Intermodal competition is advantageous for consumers and the financial strengthening of a competitor in the Pennsylvania intermodal marketplace is an affirmative public benefit of this transaction.

The combined companies' financial strength promotes intermodal competition in the state of Pennsylvania. As Joint Applicants' witness G. Clay Bailey noted, regardless of whether specific products or services are brought to the state of Pennsylvania, just the threat of strong intermodal competition has an effect of constraining prices in the marketplace and forcing market participants to enhance their service offerings.

(ALJ Initial Decision at 26.) In short, the ALJ, based upon the testimony of one of the Joint Applicants' witnesses, observed that (1) intermodal competition is advantageous for consumers; (2) pressures from intermodal competitors force ILECs, like Embarq, to seek strategies to help them remain viable in the market; (3) greater financial strength will help the merged company to participate in the intermodal marketplace and compete with existing intermodal competitors; and (4) a potential new entry into the intermodal marketplace will result in constriction of rates and enhancement of services by other intermodal

competitors. (ALJ Initial Decision at 26). Based upon these findings, we cannot agree with SBA that the PUC was required to weigh these competitive effects as a negative factor against the affirmative public benefits the PUC determined would result from the merger.

■ SBA also argues that the PUC erred in determining that the competitive impact of the merger would be positive for competition in Pennsylvania. SBA, however, bases this argument in part on the PUC's refusal to adopt SBA's recommended condition. SBA had recommended that the PUC impose a condition on the merger that the merged company must apply some of the anticipated synergy savings to relieve Embarq's ILEC customers from annual noncompetitive service rate increases. In its brief, SBA also suggests that the PUC could require the merged company to apply some of the synergy savings for accelerated deployment of broadband services.

SBA argues that based upon the PUC's decision not to require the use of synergy savings for these purposes, the merged company will be in a position to undercut other competitors, specifically CLECs. SBA contends that this potential result of the PUC's decision to approve the merger without imposing the requested condition is inappropriate because the merger will strengthen "the wrong entity"—an ILEC rather than CLECs. SBA conceives the notion that unless the PUC requires the merged company to eliminate or reduce the rates on its noncompetitive ILEC services, the new company will be able to lower the costs of its competitive services and thus will be in a position to drive providers of other competitive services in the same market out of business. Essentially, SBA is asserting that the PUC's finding that the merger will be positive for

competition in Pennsylvania is not supported by the evidence.[13]

As the PUC points out, SBA is essentially asserting that the PUC erred in weighing the evidence before it. SBA would rather have the PUC reconsider the evidence and make a determination that the *possibility* that the new company will price its services in a way that undercuts the competition is a negative factor that weighs against the affirmative public benefits. The PUC, however, did precisely what the Supreme Court directed it to do in *Popowsky*—the PUC evaluated the impact of the merger on competition and, after weighing the evidence, determined that the merger would have a positive impact on competition.

In summary, we conclude that substantial evidence supports the PUC's determination that the "merger will affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way." *Popowsky*, 594 Pa. at 611, 937 A.2d at 1057. Substantial evidence also supports the PUC's finding that the merger will be a positive factor in the competitive market in Pennsylvania. Accordingly, we conclude that the PUC did not err in granting the joint application, and we affirm the PUC's order.

### ORDER

AND NOW, this 1st day of March, 2011, the order of the Pennsylvania Public Utility Commission is AFFIRMED.

---

**13.** It is interesting that SBA believes that reducing costs to Embarq's ILEC customers would be good from a competitive perspective, as it would seem similarly likely that reduced rates to those customers might draw customers who are presently CLEC customers to Embarq.