# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PPL Electric Utilities Corporation, :
                     Petitioner :
                                  : No. 624 C.D. 2019
                           :
               v. :
                           : Argued: May 13, 2020
Public Utility Commission, :
                    Respondent :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE J. ANDREW CROMPTON, Judge

## *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                  FILED: October 27, 2020

PPL Electric Utilities Corporation (Utility) petitions for review from the April 25, 2019 order of the Pennsylvania Public Utility Commission (Commission) denying its application for approval of internal corporate restructuring pursuant to section 1102(a)(3) of the Public Utility Code (Code), 66 Pa.C.S. §1102(a)(3),[1] and the

---

[1] This section states, in notable part, as follows:

> Upon the application of any public utility and the approval of such application by the [C]ommission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, it shall be lawful . . . [f]or any public utility . . . to acquire from, or to transfer to, any person or corporation, including a

**(Footnote continued on next page…)**

Commission's *Statement of Policy* located at 52 Pa. Code §69.901. The issues presented are whether the proposed restructuring is one that would require a certificate of public convenience (CPC) and, if so, what legal standard the Commission should have utilized to determine whether to grant such a certificate. *See* section 1103(a) of the Code, 66 Pa.C.S. §1103(a) (stating that the Commission shall grant a CPC "only if the [C]ommission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public").[2]

---

**(continued…)**

> municipal corporation, by any method or device whatsoever, including the sale or transfer of stock and including a consolidation, merger, sale or lease, the title to, or the possession or use of, any tangible or intangible property used or useful in the public service.

66 Pa.C.S. §1102(a)(3).

[2] In its relevant respects, section 1103(a) provides that

> [a] certificate of public convenience shall be granted by order of the commission, only if the [C]ommission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public. The commission, in granting such certificate, may impose such conditions as it may deem to be just and reasonable. In every case, the commission shall make a finding or determination in writing, stating whether or not its approval is granted. Any holder of a certificate of public convenience, exercising the authority conferred by such certificate, shall be deemed to have waived any and all objections to the terms and conditions of such certificate.

66 Pa.C.S. §1103(a)(3).

## Background

The germane facts and procedural history of this case are as follows. On October 16, 2017, Utility filed its application and on November 21, 2017, the Office of Small Business Advocate (OSBA) filed a notice of intervention and protest, opposing the application. Thereafter, Utility and the OSBA filed a joint stipulation for the admission of evidence and submitted uncontested testimony and documents to the Administrative Law Judges (ALJs), from which we glean the following pertinent facts.

In terms of corporate structure, PPL Corporation stands at the top of the pyramid and is the bona fide parent corporation and a pure holding company that owns, among other things, a controlling share of stock of certain subsidiaries engaged in the electric utility business. Utility is a direct subsidiary of PPL Corporation and is a "public utility" as defined in section 102 of the Code, 66 Pa.C.S. §102, providing electric service to approximately 1.4 million customers in eastern and central Pennsylvania. PPL Corporation owns all of the shares of stock of Utility, and Utility owns all of its operational assets. The proposed restructuring would vertically interject two new Delaware holding companies, PPL Subsidiary Holdings, LLC (Newco 1) and PPL Energy Holdings, LLC (Newco 2), between PPL Corporation and Utility, thereby rendering Utility an indirect and down-the-stream subsidiary of PPL Corporation. Meanwhile, Newco 1 would become a wholly-owned direct subsidiary of PPL Corporation, while Newco 2 would become a wholly-owned direct subsidiary of Newco 1. PPL Corporation would then contribute all of the interests that it owns in Utility to Newco 1, and Newco 1, in turn, would contribute all of the shares of Utility's stock that it received from PPL Corporation to Newco 2. The net result would be that, through these transactions, PPL Corporation would ultimately transfer

all of the shares of stock in Utility to Newco 2.  As such, Newco 2 would become the new or immediate "parent" of Utility and Utility would become a direct subsidiary of Newco 2.  (Commission's decision at 3-6; ALJs' decision at 1-5.)

With respect to the effect that the proposed restructuring would have on PPL Corporation, Utility, and the public in general, PPL Corporation averred that the general and overall purpose of the restructuring would allow PPL Corporation to control its tax liabilities in a more prudent manner.  For instance, by consolidating the tax basis of the relevant subsidiaries within Newco 1 and Newco 2, PPL Corporation alleged that it would be able to manage the movement of cash within its corporate framework with increased efficiency, while, at the same time, mitigate the negative tax impact on capital gains.  PPL Corporation also stated that the restructuring would permit it to operate its regulated businesses more effectively because intracompany financing, including the management of Utility's capital structure and associated regulatory requirements, would be conducted and facilitated by and through Newco 1 and Newco 2, rather than PPL Corporation itself.  In addition, PPL Corporation asserted that the proposed restructuring would promote the public interest because it would create an enhanced and viable method for it to distribute cash received from Utility for purposes of funding capital expenditures and projects, and the establishment of Newco 1 and Newco 2 would provide a flexible corporate structure through which PPL Corporation could engage in business acquisitions, including the combination or consolidation of existing non-regulated corporate entities.  PPL Corporation further averred that, under the proposed reorganization, it would be able to raise equity capital at more favorable rates, which would improve Utility's financial condition and reduce the need for Utility to raise additional external debt.  According to PPL Corporation, the restructuring would have no adverse effect on the

4

finances, management, or operations of Utility, and Utility would maintain a separate investment rating from credit rating agencies. (Commission's decision at 6-7; ALJs' decision at 18-19.)

In a decision dated August 23, 2018, the ALJs recommended that Utility's application be denied in its entirety. The ALJs noted that PPL Corporation owns all of Utility's shares of stock and that, pursuant to the proposed restructuring, PPL Corporation would transfer these shares to Newco 1 and then, via a subsequent transfer, to Newco 2. The ALJs reasoned that Utility's application, in essence, sought approval to vest a new corporate entity with a controlling interest in a public utility and, therefore, PPL Corporation was required to meet the standards to obtain a CPC. The ALJs further concluded that Utility and PPL Corporation failed to establish that the proposed restructuring would result in an affirmative and substantial benefit to the public or that it would be a necessary or proper way to further the service, accommodation, convenience, or safety of the public. (ALJs' decision at 14-17, 20-21.)

On October 11, 2018, Utility filed exceptions, contending that the ALJs erred in concluding that it was required to obtain a CPC because the proposed internal restructuring would amount to a technical change in control, as opposed to a change in ultimate ownership, and would have no negative effect on its management or operations. In the alternative, Utility asserted that, even if a CPC was necessary, the ALJs erred in applying a "substantial affirmative public benefit" standard given the internal nature of the proposed restructuring.

On April 25, 2019, the Commission entered an opinion and order dismissing the exceptions filed by Utility and denying its application for corporate restructuring. Subsequently, Utility filed a petition for review in this Court.[3, 4]

**Discussion**

First, Utility argues that it did not need to obtain Commission approval and a CPC under section 1102(a)(3) of the Code because the proposed restructuring would not change the entity that would have ultimate control over the Utility, *i.e.*, PPL Corporation, would not affect the management or operations of Utility, and would not result in the transfer of title or possession of Utility's property or operational assets.[5]

Relevantly, section 1102(a)(3) of Code mandates that a corporate entity obtain a CPC when the entity seeks "**to** acquire from, or to **transfer to**, **any** person or **corporation**, including a municipal corporation, **by** any method or device whatsoever, including **the** sale or **transfer of stock** . . . **the** title to, or the **possession or use of**, **any** tangible or **intangible property used** or useful **in the public service**." 66 Pa.C.S. §1102(a)(3) (emphasis added). A "corporation" is defined in the Code as "[a]ll bodies corporate, joint-stock companies, or associations, domestic or foreign, their lessees, assignees, trustees, receivers, or other successors in interest, having any

---

[3] Our scope of review of the Commission's order is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings, determinations, or order are supported by substantial evidence. *Regency Transportation Group, Ltd. v. Pennsylvania Public Utility Commission*, 44 A.3d 107, 110 n.3 (Pa. Cmwlth. 2012).

[4] The OSBA has filed an appellate brief as an intervenor in support of the Commission.

[5] On the latter point, the Energy Association of Pennsylvania filed an *amicus curiae* brief in support of Utility and PPL Corporation.

of the powers or privileges of corporations not possessed by individuals or partnerships." 66 Pa.C.S. §102.

In the *Statement of Policy*, the Commission noted the "ambiguous language" of section 1102(a)(3) and how it had created "considerable uncertainty . . . regarding what type of transaction requires Commission approval," particularly with respect to "stock transfers which may equate to the transfer of utility property." 52 Pa. Code §69.901(a)(1). The Commission thus deemed it "necessary," with regard to stock transfers, "to further define and establish clear standards regarding what transfer of voting interest constitutes a change in *de facto* control and thereby constitutes the transfer or acquisition of utility property within the intendment of [section] 1102(a)(3)." 52 Pa. Code §69.901(a)(2).

In clarifying the vernacular in section 1102(a)(3), the Commission reiterated its holding in *Joint Application of Paging Network of Pittsburgh, Inc.* (Pa. P.U.C., No. A-330013, F.5000, filed October 22, 1993), that approval and a CPC were necessary when there was "a transaction resulting in a change of the *de facto* controlling interest in a utility or its parent, regardless of the tier in the corporate organization" because this type of transaction "constitutes a change of control of the utility." 52 Pa. Code §69.901(a)(2). Drawing on this administrative adjudication, and others, the Commission determined in the *Statement of Policy* that approval and a CPC are needed when there is "[a] transaction or series of transactions resulting in a new controlling interest," namely "when the transaction or transactions result in a different entity becoming the beneficial holder of the largest voting interest in the utility or parent, regardless of the tier." 52 Pa. Code §69.901(b)(1). By definition, "a controlling interest is an interest, held by a person or a group acting in concert, which enables the beneficial holders to control at least 20% of the voting interest in the

7

utility or its parent, regardless of the remoteness of the transaction." 52 Pa. Code §69.901(b)(2).

Here, the proposed restructuring sought to effectuate internal corporate transactions that would ultimately transfer all of the shares of Utility's stock from PPL Corporation to Newco 2. As a matter of black letter corporate law, a subsidiary (Utility) is a "corporation" in its own right, and it is an entity that is separate and distinct from its proffered immediate parent (Newco 2), thereby constituting an entirely "different entity" altogether. 52 Pa. Code §69.901(b)(1). *See, e.g.*, *Commonwealth v. Gulf Oil Corporation*, 60 A.2d 46, 48 (Pa. 1948) ("Appellant [parent corporation] and its subsidiary are distinct corporations notwithstanding that the former owns all of the latter's stock."); *Appeal of Callery*, 116 A. 222, 224 (Pa. 1922) ("A corporation does not lose its corporate identity when its stock is all owned by another corporation."); *Simon v. Commonwealth*, 422 A.2d 1229, 1230-31 (Pa. Cmwlth. 1980) (noting that a parent corporation and a subsidiary are "separate legal entities," "separate and distinct corporations," each with their own "separate corporate identity") (internal citation omitted). Pursuant to the plain language of section 1102(a)(3) and the *Statement of Policy*, Newco 2 would obtain a controlling interest in Utility, and "the transaction [would] result in a different entity becoming the beneficial holder of the largest voting interest in [Utility]." 52 Pa. Code §69.901(b)(1). Indeed, in this case, Newco 2 would receive all of the voting interest and stock in Utility, and, therefore, a CPC was mandatory in order to receive Commission approval for the proffered reorganization. This is so regardless of the fact that PPL Corporation, by way of its internal hierarchy, is associated with Newco 2—as Newco 2 is a wholly-owned subsidiary of Newco 1, and Newco 1 is a wholly-owned subsidiary of PPL Corporation—because it is Newco 2, and not PPL

8

Corporation, that would own all the stock of Utility. As the *Statement of Policy* elucidates, the fact that a new entity has obtained a controlling interest in stock is the paramount and dipositive factor in the inquiry, and considerations such as the "remoteness" or "tier" of the transactions are immaterial. 52 Pa. Code §69.901(b)(1), (2).

While this may be simple enough, PPL Corporation nonetheless argues that Utility would maintain its own internal managerial and operational facets. But this contention overlooks one basic fact and reality. That is, by owning all of the shares of Utility, and possessing a "controlling interest in [Utility]," Newco 2—the would be immediate parent company—would acquire the direct and/or indirect authority "to manage, direct, or oversee" and ultimately "govern the management and policies of [Utility]." Black's Law Dictionary 378, 885 (9th ed. 2009). *See Appeal of Callery*, 116 A. at 224 ("Holding company, as its sole stockholder, controls subsidiary [and] through its officers . . . it imposes its will on subsidiary."); *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988) ("It is assumed to be the norm that a parent will have not only . . . the potential to exercise control [over the subsidiary], but to exercise it to a substantial degree.") (internal citation and quotation marks omitted, brackets in original); *Action Manufacturing Co. v. Simon Wrecking Co.*, 375 F.Supp. 2d 411, 423 (E.D. Pa. 2005) (stating that the "officers of any corporation that owns the stock . . . necessarily exercise a considerable degree of control over the subsidiary corporation"). Consequently, Newco 2 would be vested with the authority to alter Utility's managerial and operational directions, irrespective of the fact that Newco 2 would be a wholly-owned subsidiary of Newco 1 and an indirect subsidiary, up through the corporate chain, of PPL Corporation.

PPL Corporation also takes issue with the language of section 1102(a)(3) of the Code and posits that a new corporate entity must receive the assets and property of a public utility in order for the requirements of approval and a CPC to apply. In PPL Corporation's view, the proposed transaction would not result in the transfer of any of Utility's assets and property and Newco 2 would not obtain ownership over or possession of such assets or property.

However, the language of section 1102(a)(3) was not written so narrowly and restrictively. Instead, the phraseology of the statute is very broad and encompasses instances where there is the simple "transfer of stock." 66 Pa.C.S. §1102(a)(3). Generally, a stock transfer, in its common parlance and understanding, is not tantamount to a transfer of assets. *See In re Goetz's Estate*, 85 A. 65, 66 (Pa. 1912) ("The estate, as a holder of all the stock, would not be the owner of the corporation, but only of the shares of its capital stock, which constitute a species of property entirely distinct from the corporate property."); *id.* ("We have been referred to no authority, and we know of none, that asserts the doctrine that the purchaser of all the shares of the capital stock of a corporation thereby becomes the owner of its property."). Stated otherwise, a stock transfer stands in stark contrast to a contractual exchange where the operational assets of one entity are transferred or otherwise conveyed to another entity for monetary consideration. *See Schmidt v. Boardman Co.*, 958 A.2d 498, 504 (Pa. Super. 2008), *aff'd*, 11 A.3d 924 (Pa. 2011) (discussing situations where "one company sells or transfers all of its assets to another company"). A simple stock transfer is also remarkably different from classical fundamental changes in corporate structure that yield an acquisition of assets, such as that which occurs in the case of a merger or consolidation. *See Seven Springs Farm, Inc. v. Croker*, 748 A.2d 740, 744 n.4 (Pa. Super. 2000) (*en banc*), *aff'd*, 801 A.2d

10

1212 (Pa. 2002) ("A merger occurs when a seller corporation, including all of its assets and liabilities, is absorbed into a purchasing corporation and the seller loses its identity as a separate entity.") (internal citation omitted); *id.* at 774 ("The merger of two or more corporations is neither a sale nor a liquidation of corporate property, but a consolidation of properties, powers, and facilities of the constituent companies, forming a new corporate entity.") (internal citation omitted); *Cortland Specialty Co. v. Commissioner of Internal Revenue*, 60 F.2d 937, 939 (2d Cir. 1932) ("A consolidation involves a dissolution of the companies consolidating and a transfer of corporate assets and franchises to a new company.").

Notably, section 1102(a)(3) covers transfers "by any method or device whatsoever, including the sale or transfer of stock and including a consolidation, merger, [or] sale . . . ." 66 Pa.C.S. §1102(a)(3). Because the term "including" is a word of enlargement, and not one of limitation, *see Readinger v. Workers' Compensation Appeal Board (Epler Masonry)*, 855 A.2d 952, 955 (Pa. Cmwlth. 2004), we must presume that our General Assembly intended a sale of stock to be distinct from, and in addition to, a merger, consolidation, or a sale of assets. In this vein, the *Statement of Policy* is entirely consonant with the statute by deeming the transfer of a controlling interest of stock as essentially constituting a transfer of utility property requiring Commission approval under section 1102(a)(3) of the Code. Further, the Commission's current adjudication and its *Statement of Policy*, which was adopted and became effective in 1994 and was predicated upon previous adjudications, expound upon the ambiguity surrounding what "stock transfers," in particular, should fall within the ambit of section 1102(a)(3). Consequently, and contrary to the arguments of Utility, the Commission's interpretation and application of the phrase "transfer of stock" is entitled to administrative deference. *See Snyder*

11

*Brothers, Inc. v. Pennsylvania Public Utility Commission*, 198 A.3d 1056, 1069, 1077-78 (Pa. 2018) (concluding that the Commission's interpretation of an ambiguity, in accordance with rulemaking orders, was entitled to administrative deference even though "the administrative orders were not enacted according to formal rulemaking procedures" and were "mere 'non-legislative rules,' or agency 'pronouncements,'" because the Commission had "faithfully adhered to its construction" in the rulemaking orders for years prior to the litigation that ensued in that case); *see also Pennsylvania Human Relations Commission v. Norristown Area School District*, 374 A.2d 671, 679 (Pa. 1977) (stating that an administrative agency can formulate "policy that will have the force of law," among other ways, "through adjudications which constitute binding precedents").

Moreover, as crafted by our General Assembly, section 1102(a)(3) embodies those instances where there is a "transfer of stock" that effectively assigns the "use of[] any . . . intangible property used . . . in the public service." 66 Pa.C.S. §1102(a)(3). In its corporate form, and considered in isolation and in and of itself, Utility is undoubtedly "intangible property" and is the means by which the "public service" of providing electricity is accomplished or "used." *See Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 636 (1819) ("A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law."). As explained above, Newco 2, as a result of acquiring a controlling interest in Utility, would attain the authority to exercise control over the management and operations of Utility. Hence, at the very least, the proffered restructuring would have the effect of bestowing upon Newco 2 the authority to "use" Utility in the sense that Utility would become a direct subsidiary of Newco 2, subject to Newco 2's control in terms of policy, management, and operations as they pertain to providing electric service to

the public. *See State Farm Mutual Automobile Insurance Co. v. Cavoto*, 34 A.3d 123, 133 (Pa. Super. 2011) (quoting an authoritative dictionary and defining the term "use," in part, as "the privilege or benefit of using something," "a method or manner of employing or applying something," or "the ability or power to use something"). Quite simply, Newco 2 could exercise significant influence over Utility in its conduct of providing services as a utility and, thus, shape and "use" Utility to a substantial degree with respect to the functional aspects that are associated with the assimilation and distribution of electrical energy.

On this note, based on the terms of the proposal, PPL Corporation, via a transfer through Newco 1, would relinquish not only all of its ownership interest in Utility, but also its right to exercise direct control over Utility, to Newco 2.[6] Because PPL Corporation seeks to divest itself of any and every direct legal interest that it has in Utility, it is difficult to understand how the Concurring and Dissenting Opinion (CDO) repeatedly pronounces that PPL Corporation "would [] retain sole ultimate ownership of Utility" and "ultimate title to Utility and its assets." *PPL Electric Utilities Corp. v. Public Utility Commission* (Pa. Cmwlth., 624 C.D. 2019, filed October 27, 2020) (Ceisler, J., concurring and dissenting) (CDO), slip op. at 2, 8. To be sure, the CDO attempts to support this proposition with a blanket statement that

---

[6] The only connection PPL Corporation would have to Utility is that PPL Corporation would wholly own Newco 1, Newco 1 would wholly own Newco 2, and Newco 2 would wholly own Utility. By owning all of the shares of Utility's voting stock, Newco 2 has direct control of Utility and the authority to "use" and dictate Utility in any manner that it deems fit, including its operational strategies and objectives. Although PPL Corporation could potentially exert indirect influence on (or rather render advice to) Newco 2, because PPL Corporation wholly owns Newco 1, and Newco 1 wholly owns Newco 2, PPL Corporation cannot legally compel Newco 2 or Utility to abide by those directives. In other words, the board of directors of PPL Corporation cannot get together and vote to change Utility's operational policy because PPL Corporation does not possess any of Utility's stock and, hence, lacks the voting power necessary to effectuate such a change.

13

relegates "the stock transfers to Newco 1 and 2" to "merely paper transactions." *Id.* Unfortunately, as explained above, the law governing stock transfers of a controlling interest in a corporation does not share this view, *see Appeal of Callery*, 116 A. at 224; *Craig,* 843 F.2d at 150; *Action Manufacturing Co.*, 375 F.Supp. 2d at 423, and neither do the courts, which have interpreted statutory provisions substantially similar to section 1102(a)(3) and the *Statement of Policy*. For example, in *Title Insurance and Trust Co. v. County of Riverside*, 767 P.2d 1148 (Cal. 1989), the Supreme of California interpreted a statute, which, akin to section 1102(a)(3) and the *Statement of Policy*, stated, in pertinent part, that "[w]hen a corporation . . . obtains control through direct or indirect ownership or control of more than 50[%] of the voting stock of any corporation . . . the purchase or transfer of that stock . . . shall be a change of ownership of the real property owned by the corporation . . . in which the controlling interest is obtained." Cal. Rev. & Tax Code §64(c) (1995) (section 64(c)). In discussing this provision, the California court persuasively explained,

> [t]he section provides, in essence, that if one corporation either directly or indirectly obtains control over another by the transfer or purchase of stock, a change of ownership occurs as to the real property owned by the corporation over which it has obtained direct or indirect control . . . . The fundamental requirement for a **change in ownership** under the section is the obtaining of *control* of the corporation that owns the property subject to reassessment, whether that control is obtained directly or indirectly. The purchase of stock is the means by which the control [is] secured.

*Title Insurance and Trust Co.*, 767 P.2d at 1152 (bold emphasis added); *see id.* at 1156 ("As we emphasize repeatedly above, the touchstone of a change of ownership under section 64(c) is control of the corporation that owns the property subject to reassessment; it is not the right to occupy the property or to take possession of it.").

14

Likewise, in section 1102(a)(3), our General Assembly determined that a "transfer of stock" could result in "the possession or use of [a utility's] tangible or intangible property," 66 Pa.C.S. §1102(a)(3), and the *Statement of Policy* declares that when "a different entity becom[es] the beneficial holder of the largest voting interest in the utility," 52 Pa. Code §69.901(b)(1), the transaction "constitutes the transfer or acquisition of utility property within the intendment of [section 1102(a)(3)]." 52 Pa. Code §69.901(a)(2).

Otherwise, the CDO, in an apparent form of fact-finding, appears to credit, at face value, PPL Corporation's assertion that it would retain ultimate control over and ownership of Utility because PPL Corporation "is not seeking to deny responsibility for Utility's obligations" and would be estopped "from asserting in the future that [it] lacks such ownership, control, and responsibility." (CDO, slip op. at 12.) However, the Commission, as the actual fact-finder in these proceedings, *see Kviatkovsky v. Pennsylvania Public Utility Commission*, 618 A.2d 1209, 1211 (Pa. Cmwlth. 1992), did not find PPL Corporation's representation credible, seemingly because it lacks any basis in law or fact. To the extent that the CDO and Utility rely on the theory of piercing the corporate veil to establish that PPL Corporation would have ultimate ownership and control of Utility, such reliance is severely misplaced. Traditionally, the doctrine of piercing the corporate veil has been used to allow a court to "ignore the corporate boundaries between parent and subsidiary if fraud or inequity is shown," *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F.Supp. 1458, 1463 (D. Del. 1991), and, if so, "the parent corporation will be held liable for the obligations of its subsidiary." *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831, 839 (D. Del. 1978). To pierce the corporate veil, a plaintiff must show that the defendant corporation is "involved in an elaborate shell game or

[is] otherwise abusing the corporate form to effect a fraud," for example, when the parent corporation exercises such "exclusive domination and control . . . to the point that [the subsidiary] no longer ha[s] legal or independent significance of [its] own." *Outokumpu Engineering Enterprises, Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 & n.2 (Del. Super. Ct. 1996). In short, while the equitable doctrine of piercing the corporate veil is a way to impose liability on a parent for a subsidiary's conduct, it has never been a means through which a corporation can create distinct corporate entities like subsidiaries to control wholly-owned subsidiaries, and then disregard that corporate form and structure in order to exercise the very right of ownership and control that it has transferred to those subsidiaries and wholly-owned subsidiaries. Therefore, we believe that the CDO offers an unpersuasive expression of rationale to support its position.

For these reasons, we conclude that the Commission did not err in determining that Utility's proposed restructuring would require approval and a CPC for purposes of section 1102(a)(3) of the Code.

Next, Utility asserts that, assuming *arguendo*, it was required to receive a CPC, it was not required to establish that its internal reorganization would confer a substantial, affirmative benefit to the public. In this regard, Utility posits that application of such a standard "would produce an absurd and unreasonable result as it would create a standard of review of internal reorganizations that, for all practical purposes, would be impossible to meet." (Br. for Utility at 26.) Emphasizing the plain language of section 1103(a) of the Code, the Utility contends that the phrase, "necessary or proper," is disjunctive in nature and that a showing that the proffered reorganization would be proper for serving the public with electricity would suffice.

16

To recapitulate, section 1103(a) provides that a CPC "**shall be granted by order of the [C]ommission, only if the [C]ommission shall find or determine that the** granting of such **certificate is** necessary or **proper for the service**, accommodation, convenience, or safety **of the public**." 66 Pa.C.S. §1103(a) (emphasis added).

In its adjudication, the Commission applied an "affirmative public benefit" standard and, for support, relied predominately upon two decisions from our Supreme Court. (Commission's decision at 41.) *See City of York v. Pennsylvania Public Utility Commission*, 295 A.2d 825, 828 (Pa. 1972) (stating that section 1103(a) "makes it clear that a [CPC] approving a merger is not to be granted unless the Commission is able to find affirmatively that [a] public benefit will result from the merger"; the statute "requires that the proponents of a merger demonstrate that the merger will affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way") (internal quotation marks omitted); *accord Popowsky v. Pennsylvania Public Utility Commission*, 937 A.2d 1040, 1057 (Pa. 2007) ("[A]s indicated in *City of York,* the appropriate legal framework requires a reviewing court to determine whether substantial evidence supports the Commission's finding that a merger will affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way."). In point of fact, the Commission determined that, "as an administrative agency, [it was] bound by judicial interpretation of the Code," (Commission's decision at 40 n.10), indicated that it had no choice or discretion in the matter, and stated that, pursuant to *City of York* and *Popowsky*, it was obligated to decide whether Utility's proposed restructuring would confer an "affirmative public benefit." (Commission's decision at 40-41.)

17

However, as this Court has noted, both *City of York* and *Popowsky* "provided [] guidance for reviewing **merger applications**." *Lloyd v. Pennsylvania Public Utility Commission*, 17 A.3d 425, 430 (Pa. Cmwlth. 2011) (emphasis added). This observation is extremely critical because, in the unique and specific context when there is a proffered merger between two utility companies at the parent level or otherwise, there are overarching and serious concerns about the potential for attaining monopolistic power, which could have an adverse effect on consumer rates.

By way of background, "[i]n Pennsylvania, the regulation of electric service distribution has traditionally afforded utility companies natural monopolies" *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998), or, in other words, "a regulated quasi-monopoly." *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 128 A.2d 372, 386 (Pa. Super. 1956). In 1996, our General Assembly passed the Electricity Generation Customer Choice and Competition Act (Competition Act),[7] which became effective in 1997. In terms of electric distribution, this legislation "effectuated . . . the de-regulation of the electric market," *PECO Energy Company v. Commonwealth*, 919 A.2d 188, 189 (Pa. 2007), and "was passed to encourage a more competitive marketplace for electricity sales." *Spectrum Arena Limited Partnership v. Commonwealth*, 983 A.2d 641, 645 (Pa. 2009). Stated otherwise, the Competition Act was based on the underlying view that "[c]ompetitive market forces are more effective than economic regulation in controlling the cost of generating electricity," *George v. Pennsylvania Public Utility Commission*, 735 A.2d 1282, 1284, 1288 (Pa. Cmwlth. 1999), and "was enacted to encourage a competitive wholesale electric market and to provide cost savings to

_____

[7] 66 Pa.C.S. §§2801-2812.

18

consumers." *American Electric Power Service Corporation v. Commonwealth*, 160 A.3d 950, 955 (Pa. Cmwlth. 2017).

In *West Penn Power Co.*, the City of Pittsburgh commenced suit against two electrical utility companies that were planning to merge, asserting claims under section 1 of the Sherman Antitrust Act (Sherman Act)[8] and section 7 of the Clayton Act.[9] Addressing the nature of these claims in light of the Commission's regulatory oversight of public utilities, the United States Court of Appeals for the Third Circuit stated:

> The present case arises in a factual context which is substantially different from that of most antitrust cases. The [City of Pittsburgh] has alleged anticompetitive behavior in an industry which is highly regulated: those [that] wish to compete to provide their services must obtain a [CPC] from the [the Commission] to do so. As the First Circuit has explained, "[f]ull price regulation dramatically alters the calculus of antitrust harms and benefits." *Town of Concord, Massachusetts v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990) (holding that alleged price squeeze did not violate [the] Sherman Act because utility's rates were regulated). Similarly, here, the regulation which frames the issue is the statutory requirement that a utility obtain permission from the [Commission], in the form of a [CPC], in order to provide electric service to a particular geographic region.
>
> The [United States] Supreme Court has made clear that regulated industries—even those that historically have been treated as natural monopolies—are not exempt from the antitrust laws. *See Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973). However, in this case, the comprehensive regulatory framework significantly restricts

---

[8] 15 U.S.C. §1.

[9] 15 U.S.C. §18.

the nature of the competition which is permitted. While it is true that the regulatory landscape of the electric power industry is in the process of changing, even the Competition Act does not anticipate a completely "free market" for electric services. Rather, the changes will result in a form of regulated competition.

*West Penn Power Co.*, 147 F.3d at 263-64.

That said, in *City of York*, which was decided prior to the Competition Act, our Supreme Court instructed "that the Commission should consider, at least in a general fashion, the effect that a proposed merger is likely to have on future rates to consumers" because "the probable general effect of the merger upon rates is certainly a relevant criter[ion] of whether the merger will benefit the public." 295 A.2d at 829. Approximately 35 years after *City of York* was decided, our Supreme Court reaffirmed and clarified that decision in *Popowsky*. In doing so, the Court noted "that *City of York* does not hold that a merger benefits the public *only* if the [proponent] can demonstrate that the merger savings will lower prices to consumers" and added that "competitive impact is a substantial component of a rational net public benefits evaluation in the merger context." 937 A.2d at 1056 (emphasis in original).

Then, in *Lloyd*, this Court discussed and synthesized *City of York* and *Popowsky*. We explained that when conducting an "affirmative public benefit" inquiry,

> the Supreme Court instructed the [Commission] in all cases of merger, (1) to evaluate the competitive effects of the merger; and, (2) if the effects of the merger are *anti-competitive,* then the [Commission] must consider whether those *anti-competitive* effects outweigh or "negate" the affirmative public benefits it has identified. If the [Commission] concludes that the *anti-competitive* effects outweigh the affirmative public benefits, then the [Commission] should not issue a [CPC].

*Lloyd*, 17 A.3d at 432 (internal citation omitted) (emphasis in original).

20

In enacting section 1103(a) of the Code, our General Assembly "provided no definition of specifically what the criteria were to be in determining the propriety of granting a [CPC]." *Elite Industries, Inc. v. Pennsylvania Public Utility Commission*, 832 A.2d 428, 432 (Pa. 2003). In light of the inherent nature of mergers, "transactions [which] are so highly regulated," *Popowsky*, 937 A.2d at 1057, considered in the background of federal antitrust laws and later the Competition Act, we can readily discern that mergers and consolidations are deserving of special attention in terms of their impact on the public. And, given the Commission's regulatory role and oversight with respect to a merger's effect on competition in the marketplace, it makes complete sense that our Supreme Court would engraft an "affirmative public benefit" standard into the statute and develop an analytical framework that focuses on competitive effects, while taking into account the rate prices that will inure to consumers. This is especially true considering that when dealing with utilities in the merger scenario, if the thrust of a proffered merger, on balance, would result in anticompetitive behavior, then public utilities could resort to the monopolistic and/or monopsonistic practices of the antiquated past, potentially resulting in unreasonable increases in consumer prices and harm to the public in general.

However, in the circumstances before us, the concerns and dangers associated with anticompetitive behavior are not present, or at least not present to a degree that is reasonably comparable to those that could occur in the situation of a merger. In its proposed internal restructuring, Utility is not seeking to gain a larger share of market power by combining two separate public utilities. Rather, the proffered reorganization would merely divest PPL Corporation of any and all interests, including a controlling share of stock, that it has in Utility and would

transfer these interests to Newco 1 and Newco 2 as holding companies. Perhaps significantly, holding companies have traditionally been created for internal structural advantages, namely in order to receive shelter from legal liability, obtain tax benefits, and facilitate strategic corporate finance objectives. *See* Douglas G. Smith, *Piercing the Corporate Veil in Regulated Industries*, 2008 B.Y.U. L. REV. 1165, 1170-71 (2008) (noting that "limited liability is the rule not the exception" for holding companies, parents, and subsidiaries and explaining that "[c]ourts will pierce the corporate veil only in exceptional circumstances" because "disregarding the corporate form and imposing liability on affiliated corporate entities is an extreme remedy, sparingly used"); 1189 ("[H]olding companies can provide subsidiaries with a level of financial flexibility, including capital infusions, access to capital markets, and in some cases, additional cash flow sources from other operations."); 1190 ("[H]olding companies can be advantageous from a tax perspective; by combining losses and gains from different subsidiaries, all companies may benefit through reduction in tax liabilities."). In its application, Utility averred benefits that arguably duplicate or mimic those above and have asserted that the proposed internal reorganization would not have a detrimental effect on the public, but instead, could be advantageous to the public due to the possibility that Utility would be more fiscally sound and secure.

In view of the schematics of Utility's proposed internal restructuring, it would be very difficult, if not impossible, for Utility to establish an affirmative and substantial benefit to the public as that concept has been employed by our Supreme Court when there has been a proposed merger between two or more public utilities. Distilled to its essence, the test to decide whether there is an affirmative public benefit necessitates the Commission to "evaluate[] the impact of [a] merger on competition" and to ultimately determine if "the merger would have a positive impact

on competition," *Lloyd,* 17 A.3d at 434, or lower prices to consumers. *See City of York*, 295 A.2d at 829. Quite simply, this mode of analysis does not fit the facts of this case and has no place in the calculus for determining whether Utility has met the statutory requirements for a CPC.

Our Supreme Court has cautioned that its decisions must be read against their specific facts because "decisional law generally develops incrementally, within the confines of the circumstances of cases as they come before the Court." *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582, 604 (Pa. 2012). We follow that lead here and conclude that the "substantial" and "affirmative public benefit" test developed in *City of York* and *Popowsky* is circumscribed to utilities' applications for a merger, consolidation, or the like, specifically where two separate public utilities propose to combine. This analysis, however, is ill suited and unworkable for internal reorganizations such as the one in this case, where a parent creates subsidiaries that are set up as holding companies and only one public utility is moved downward in the parental vertical chain. In this situation, a less demanding evidentiary burden is warranted—one that does not mandate an appraisal of the effects on competition in the marketplace, yet is consistent with the plain language of the statute, and pays due consideration to the public. Therefore, the Court concludes that, contrary to the Commission's understanding, the Commission was not bound to apply the test enunciated in *City of York* and *Popowsky*, and we reverse the Commission on this point.

In *Elite Industries, Inc.*, our Supreme Court reviewed section 1103(a) of the Code and concluded that this Court erred in determining that an applicant for a CPC to operate a limousine service had to prove "public necessity" or "public need." 832 A.2d at 430-31. The Supreme Court found that we erroneously "focused only on

the word 'necessary' rather than on the phrase 'necessary or proper.'" *Id.* at 431. "However," said the Supreme Court, "the conjunction 'or' must be given its ordinarily disjunctive meaning unless such a construction would lead to an absurd result." *Id.* Heeding this advice, we believe the Commission can conduct a disjunctive analysis in this case and that, for purposes of section 1103(a), Utility need only establish—and the Commission need only find—that granting a CPC would be "proper for the service . . . of the public." 66 Pa.C.S. §1103(a). As a general guide, the customary dictionary definition of "proper" is being "adapted or appropriate to the purpose or circumstances; fit; suitable." *Vodvarka v Grasmeyer*, 675 N.W.2d 847, 853 (Mich. Ct. App. 2003) (quoting Random House College Dictionary 1061 (rev. ed. 1979)). Nonetheless, we leave it to the sound discretion of the Commission to formulate the specific criteria or factors to be used in assessing whether Utility's proposed internal restructuring is "proper" for servicing the public with electricity and deserving of a CPC. *See Elite Industries, Inc.*, 832 A.2d at 432. Accordingly, we remand to the Commission to undertake this inquiry and determine whether Utility is entitled to a CPC pursuant to the above-mentioned standard.[10]

---

[10] Ostensibly, the CDO wants to import a revised version of the "affirmative public benefit standard" that our Supreme Court has developed in the context of merger acquisitions to this case. According to the CDO, "Utility met its burden of showing a substantial affirmative public benefit by establishing the financial advantages" that would inure to PPL. Corporation, specifically, "a stronger company, ease of access to money markets, improved administrative efficiencies, and tax benefits." (CDO, slip op. at 13, 15.) Respectfully, we believe that there is no "public" in the CDO's "affirmative public benefit" analysis—only the strengthening of a corporate entity and the potential pavement of its way toward monopolistic power in its most archaic and oppressive form.

For all of the foregoing reasons and grounds, we affirm in part and reverse and remand in part.

_____
PATRICIA A. McCULLOUGH, Judge

Judge Fizzano Cannon did not participate in this decision.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PPL Electric Utilities Corporation, :
                    Petitioner :
                       : No. 624 C.D. 2019
           v. :
                       :
Public Utility Commission, :
                    Respondent :

## ***ORDER***

AND NOW, this 27th day of October, 2020, the April 25, 2019 order of the Pennsylvania Public Utility Commission (Commission) is affirmed in part and reversed in part. The matter is remanded to the Commission for further proceedings consistent with this opinion.

        Jurisdiction relinquished.

                                    _____
                                    PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PPL Electric Utilities Corporation, :
                       Petitioner :
                                   :
         v.                   :  No. 624 C.D. 2019
                                     :  ARGUED: May 13, 2020
Public Utility Commission, :
                    Respondent :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE J. ANDREW CROMPTON, Judge

OPINION NOT REPORTED

DISSENTING/CONCURRING OPINION
BY JUDGE CEISLER                     FILED: October 27, 2020

Respectfully, I concur in part and dissent in part.

I disagree with the majority's conclusion that a certificate of public convenience from the Pennsylvania Public Utility Commission (PUC) was required for an internal corporate restructuring in which the parent corporation, PPL Corporation (Parent), would retain ultimate ownership of a wholly owned subsidiary, PPL Electric Utilities Corporation (Utility).

Even if a certificate of public convenience was required, I believe the PUC erred as a matter of law by determining that the evidence demonstrated no substantial affirmative public benefit from Parent's proposed internal restructuring. Therefore, I agree with the majority's reasoning insofar as it reverses the PUC's finding of no

affirmative public benefit.  However, I do not believe a remand is needed to allow the PUC to reconsider its decision under a different legal standard.

## I. Background

Parent currently owns all shares of Utility directly.  Utility applied to the PUC for approval of Parent's proposal to insert two new wholly owned subsidiary holding companies, PPL Subsidiary Holdings, LLC (Newco 1) and PPL Energy Holdings, LLC (Newco 2), between Parent and Utility in the corporate structure, as part of a larger internal restructuring.  The ownership of Utility is illustrated as follows:

**Current:**  Parent —> Utility

**Proposed:**  Parent —> Newco 1 —> Newco 2 —> Utility

*See* Reproduced Record (R.R.) at 106a-07a (illustrating complete present and proposed corporate structures). Under the restructuring proposal, each entity in the chain of ownership would wholly own the entity below.  Thus, Parent would still retain sole ultimate ownership of Utility through its ownership of Newco 1 and Newco 2.

Parent proposed the restructuring in order to manage intercompany cash flows more effectively, operate more efficiently, and manage its tax liabilities more prudently, thereby improving its financial profile.  The proposed restructuring would not alter the management or operations of Utility.  Parent also would retain ultimate control over all of its subsidiaries, including Utility.

Two administrative law judges (ALJs) issued a decision recommending that the PUC deny Utility's application for approval of Parent's proposed restructuring. The ALJs concluded that although the restructuring might benefit the shareholders

and would not harm the public, it would not provide a substantial affirmative public benefit to Utility's customers. *See* R.R. at 98a.

Utility filed exceptions to the ALJs' decision. In a 3-2 decision with two dissenting statements, the PUC denied Utility's exceptions. R.R. at 149a-50a. The PUC majority concluded that Parent's proposed internal restructuring required a certificate of public convenience pursuant to Section 1102(a)(3) of the Public Utility Code, 66 Pa.C.S. § 1102(a)(3) (Section 1102(a)(3)), because the proposed new structure would constitute a *de facto* change of control of Utility, as set forth in the PUC's Policy Statement at 52 Pa. Code § 69.901 (Policy Statement). R.R. at 139a-42a; *see also Policy Statement Regarding Interpretation of 66 Pa.C.S. § 1102 (a)(3)* (Pa. P.U.C., No. M-930490, filed September 13, 1994), 1994 Pa. PUC LEXIS 56. The PUC majority denied Utility's application, agreeing with the ALJs that Utility failed to demonstrate the proposed restructuring would produce a substantial affirmative public benefit to its customers. R.R. at 148a.

Two Commissioners voted against denying the restructuring proposal. Commissioner John F. Coleman, Jr. opined that Utility met its burden of demonstrating that the restructuring would provide a substantial affirmative public benefit. Noting that Parent "is the ultimate source of equity capital" for Utility, Commissioner Coleman found that improved cash flow and more efficient financial management would result in "reduced capital needs and an improved ability to raise capital at more favorable rates, thereby benefitting [Utility's] customers." R.R. at 157a. Citing the PUC's own decision in *Application of Duquesne Light Co. for a Certificate of Public Convenience Under Section 1102(a)(3)* (Pa. P.U.C., Nos. A-110150 & A-311233, filed April 24, 2007), Commissioner Coleman concluded that

"[m]ore efficient access to capital has been previously recognized by the [PUC] as an example of an affirmative public benefit." R.R. at 158a.

Commissioner Norman J. Kennard also dissented. Commissioner Kennard observed that the restructuring would involve "no change in the ultimate control of [Utility] or any of the other entities involved," that Parent would remain the 100% owner of all subsidiaries, and that there would be no change in Utility's management. R.R. at 152a. Noting the PUC's own conclusion that Section 1102(a)(3) was intended to address transfers of control, Commissioner Kennard opined, "I don't think that we should have it both ways. Having declared Section 1102(a)(3) to be a change of control statute via the Policy Statement, the [PUC] should not now rule that a change of control is not required for the [PUC] to have jurisdiction over a transaction under Section 1102(a)(3)." R.R. at 153a. Therefore, he concluded no certificate of public convenience was needed for the restructuring.

Alternatively, Commissioner Kennard suggested that even if a certificate of public convenience was required, Utility sustained its burden of demonstrating a substantial affirmative public benefit through increased cash flow flexibility and better management of tax liabilities. Like Commissioner Coleman, Commissioner Kennard pointed to the PUC's prior determination that "the ability of a parent company of a utility to raise capital on reasonable terms and attract investors is an example of a substantial public benefit under Section 1102(a)(3) and the *City of York*[1] standard." R.R. at 154a.

Even one of the three Commissioners who voted to deny Utility's application did so reluctantly. Vice Chairman David W. Sweet found the outcome of the PUC's majority decision "troubling" and voted "regretfully" to deny Utility's application,

---

[1] *City of York v. Pa. Pub. Util. Comm'n*, 295 A.2d 825 (Pa. 1972). Our Supreme Court's decision in *City of York* is discussed in Section III, C, below.

commenting that he had "difficulty believing the General Assembly intended this interpretation of Section 1102[(a)(3)] . . . ." R.R. at 156a.

## II. Issues

Utility raises several related arguments in its petition for review:

1.    The PUC erred as a matter of law by concluding that a certificate of public convenience was required for the proposed restructuring.

2.    The PUC erred as a matter of law by concluding that its Policy Statement required the restructuring proposal to meet the requirements of Section 1102(a)(3).

3.    Even assuming a certificate of public convenience was required, the PUC erred as a matter of law and abused its discretion in applying the "substantial affirmative public benefit" standard to the restructuring proposal.

## III. Discussion
### A. Certificate of Public Convenience Requirement
### 1. Section 1102(a)(3)'s Provisions

Section 1102(a)(3) specifies when a certificate of public convenience must be obtained from the PUC. Section 1102(a)(3) provides, in pertinent part:

> (a) General rule.--Upon the application of any public utility and the approval of such application by the [PUC], ***evidenced by its certificate of public convenience first had and obtained***, and upon compliance with existing laws, it shall be lawful:
>
> * * *
>
> (3) For any public utility or an affiliated interest of a public utility. . . ***to acquire from, or to transfer to, any person or corporation***, including a municipal corporation,

*by any method or device whatsoever, including the sale or transfer of stock* and including a consolidation, merger, sale or lease, *the title to, or the possession or use of, any tangible or intangible property used or useful in the public service*.

66 Pa.C.S. § 1102(a)(3) (emphasis added).

### 2. The Policy Statement's Provisions

In the Policy Statement, the PUC concluded that Section 1102(a)(3) is ambiguous, resulting in confusion "regarding what type of transaction requires [PUC] approval." 52 Pa. Code § 69.901(a)(1). The PUC then "determined that the transfer of stock or other voting interest of a utility's parent is jurisdictional [*i.e.*, it requires a certificate of public convenience approved by the PUC] regardless of the remoteness of the transaction *if the effect of the transaction is to change the control* of a utility." 52 Pa. Code § 69.901(a)(2) (emphasis added). Further, "a transaction resulting in a *change of the de facto controlling interest in a utility or its parent, regardless of the tier in the corporate organization, constitutes a change of control of the utility* and is jurisdictional under [Section 1102(a)(3)]." *Id.* (emphasis added).

### 3. Utility's Position

Utility observes that the PUC's interpretation of a statute is not entitled to deference from courts unless the statute is ambiguous. *See Scanlon v. Dep't of Pub. Welfare*, 739 A.2d 635, 636 (Pa. Cmwlth. 1999). Utility asserts that, contrary to the PUC's conclusory averment in the Policy Statement, Section 1102(a)(3) is not ambiguous. Utility argues Section 1102(a)(3) facially does not require a certificate of public convenience here, because the proposed restructuring would not transfer any title, possession or use of property useful in the public service (*i.e.*, any interest

in Utility); rather, Parent would continue to hold the ultimate ownership and control of Utility.

Utility also contends that even if Section 1102(a)(3) is ambiguous, the legislature did not intend to require a certificate of public convenience for an internal restructuring that does not alter the ultimate ownership or control of a utility. Utility argues Parent is entitled to autonomy in its internal structuring. The legislature did not intend to, nor could it, assert control over purely internal organizational transactions.

## 4. PUC's Position

The PUC contends Section 1102(a)(3) is reasonably susceptible to more than one interpretation, and accordingly, it is ambiguous. Therefore, the PUC insists the Policy Statement, as the PUC's interpretation of Section 1102(a)(3), is entitled to deference.

The PUC also disputes Utility's contention that no change of control would occur through the proposed restructuring. The PUC argues that as a matter of law, the proposed new subsidiaries, Newco 1 and Newco 2, are separate legal entities. Therefore, the proposed restructuring would result in a change of ownership and control, despite Parent's retention of ultimate ownership of all its subsidiaries. The majority essentially adopts this argument.

## 5. Analysis
### a. Ambiguity

As Utility points out, whether Section 1102(a)(3) is ambiguous is a question of first impression for Pennsylvania courts; only the PUC has so far made such a

determination. Contrary to the PUC's position, in my view, Section 1102(a)(3) is unambiguous as it applies to this case. Section 1102(a)(3) provides that a certificate of public convenience is required for a transfer of "***the title to, or the possession or use of, any tangible or intangible property used or useful in the public service.***" *Id.* (emphasis added). That language is clear. Because the statute is not ambiguous, the PUC's interpretation of it is not entitled to deference from this Court. *See Scanlon*, 739 A.2d at 636.

Moreover, even according deference to the PUC, its reading of Section 1102(a)(3) is incorrect. Parent proposes to retain ultimate title to Utility and its assets, while Utility would retain possession and use of the property over which it exercises control in its normal operations. By contrast, neither Newco 1 nor Newco 2 would gain either ultimate title to Utility or possession and use of its assets.

The PUC's distinction between ultimate control and *de facto* control also seems inapt here. It is evident from the record that the stock transfers to Newco 1 and 2 as part of the planned restructuring are merely paper transactions and that Newco 1 and 2 will be merely holding companies formed to facilitate financial and tax transactions. Parent will retain *de facto* control as well as ultimate ownership.

In my view, Parent's proposed internal restructuring would not transfer title, possession, or use of any property of Utility that is "used or useful in the public service." Section 1102(a)(3), 66 Pa. C.S. § 1102(a)(3). Accordingly, I respectfully disagree with the majority's conclusion that a certificate of public convenience is required for Parent's proposed internal restructuring.

### b. PUC's Judicial Estoppel Argument

The PUC also argues that Parent and Utility are foreclosed by the principle of judicial estoppel from denying the requirement of a certificate of public

convenience. According to the PUC, Utility's very application for a certificate of public convenience constituted a representation that one was required. Although the majority's analysis made it unnecessary to address this argument, I do so here for completeness. In my opinion, the PUC's judicial estoppel argument is without merit.

Judicial estoppel applies to prevent a party that has successfully asserted a position in one legal proceeding from later asserting the opposite position in a subsequent proceeding. *Trowbridge v. Scranton Artificial Limb Co.*, 747 A.2d 862 (Pa. 2000). The purpose of the doctrine of judicial estoppel is to prevent litigants from "'play[ing] fast and loose' with the courts by switching legal positions to suit their own ends." *Id.* at 865 (quoting *Ligon v. Middletown Area Sch. Dist.*, 584 A.2d 376, 380 (Pa. Cmwlth. 1990)); *see also id.* (quoting *Gross v. City of Pittsburgh*, 686 A.2d 864, 867 (Pa. Cmwlth. 1997) ("the purpose of this doctrine is to uphold the integrity of the courts by 'preventing parties from abusing the judicial process by changing positions as the moment requires'")).

For judicial estoppel to apply, the estopped party's asserted positions on the pertinent issue must be completely inconsistent,[2] and the party must have prevailed on that issue in the prior proceeding. *See Trowbridge*. Here, Utility did not assert in its application that a certificate of public convenience was required; in fact, it

---

[2] For example, in *Trowbridge*, the plaintiff, who suffered from muscular dystrophy, was fired from her job. She sought and obtained social security disability benefits on the basis that she was totally disabled. She then sued her former employer under the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963, alleging she was improperly fired on the basis of a non-job-related disability, because she was capable of performing her job with a reasonable accommodation. Our Supreme Court rejected the former employer's assertion of judicial estoppel. The Court reasoned that the criteria for assessing eligibility for social security disability did not include consideration of possible job accommodations. Therefore, it was not necessarily inconsistent for the plaintiff to sue her former employer, alleging she could have performed her job with a reasonable accommodation, while also receiving social security benefits based on total disability.

asserted that it was ***not*** required.  Utility merely requested any approval that might be necessary for Parent's restructuring.  *See* Petitioner's Reply Br. at 15-16 and record cites therein.  Moreover, Utility was ***un***successful in asserting before the PUC that no certificate of public convenience was required for the restructuring.  *Id.* Therefore, neither element of judicial estoppel was met.

Indeed, it would have been reckless for Parent to proceed with its restructuring without informing the PUC and seeking review.  Such a course of action would have exposed both Parent and Utility to potentially damaging consequences if the PUC decided – as in fact it did – that its approval was required for the restructuring to move forward.  By seeking the necessary approval, ***if any***, before implementing the restructuring, Parent and Utility were simply acting prudently; they were not conceding that such approval was definitely required.

For all of the reasons discussed above**,** I conclude that no change of ownership or control of Utility would result from Parent's proposed internal restructuring. Accordingly, the PUC erred in concluding that a certificate of public convenience was required for Parent's proposed restructuring.  I respectfully dissent from the majority's conclusion on this issue.

## B. PUC Policy Statement and Internal Restructuring

Notably, the PUC has not previously applied Section1102(a)(3) to require a certificate of public convenience for a purely internal restructuring; this is an issue of first impression.  As Utility aptly points out, the PUC's Policy Statement emphasizes the element of "*de facto*" control as key in determining whether a certificate of public convenience is required.  Utility's argument that *de facto* control of Utility would not change under the proposed restructuring is well taken.  Newco 1 and 2, as their corporate names suggest, would be holding companies, passing

through ultimate ownership and control of Utility to Parent. Indeed, the majority correctly acknowledges that a mere transfer of stock does not convey any corporate assets. Moreover, the day-to-day management of Utility itself would remain unchanged.

The PUC points out that Newco 1 and 2, which are limited liability corporations (LLCs), are separate corporations. The PUC reasons that corporate separation must be maintained, notwithstanding Parent's sole ultimate ownership of all its subsidiaries. Therefore, according to the PUC, insertion of holding companies in the chain of ownership between Parent and Utility constitutes a change in Utility's ownership for purposes of requiring a certificate of public convenience. The majority again agrees with the PUC. Respectfully, I believe the majority errs by failing to consider in its analysis the applicable law governing business corporations generally.

Utility essentially seeks to pierce the corporate veil to acknowledge Parent's ultimate ownership and control of Utility. Newco 1 and 2 are LLCs registered in Delaware. Therefore, Delaware law governs piercing of the corporate veil. *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010 (Pa. 2018).

Delaware law generally recognizes the legal separation of corporate entities, but a court will disregard the corporate form where equitable considerations require it in the interests of justice. *Mabon, Nugent & Co. v. Texas Am. Energy Corp.* (Del. Ch., No. 8578, filed January 27, 1988), 1988 Del. Ch. LEXIS 11. Under Delaware law, a party seeking to pierce the corporate veil must plead and prove detailed facts in support. *Albert v. Alex. Brown Mgmt. Servs.* (Del. Ch., Nos. 762-N, 763-N, filed August 26, 2005), 2005 Del. Ch. LEXIS 133.

For example, in *Mabon*, the plaintiffs alleged that the defendant had led them to believe it was assuming the liabilities of its subsidiary as part of a corporate consolidation and reorganization. The complaint also alleged that both parent and subsidiary operated through joint management, obtained their financing through a joint credit agreement, and jointly engaged in borrowings and intercorporate transfers of assets. Further, the parent listed the subsidiary's debts as part of the parent's obligations in federal securities filings and submissions to credit rating services. The Delaware court found the plaintiffs pleaded sufficient facts to support their request to pierce the corporate veil. Moreover, the complaint averred sufficient facts to support the plaintiffs' assertion that the defendant was estopped from denying responsibility for its subsidiary's obligations.

Significantly, here, Parent is not seeking to deny responsibility for Utility's obligations. On the contrary, Parent insists that its proposed insertion of two wholly owned subsidiary LLC holding companies between itself and Utility in the corporate hierarchy is purely an internal restructuring tool that will improve efficiency and financial performance without altering Parent's ultimate ownership and control of Utility. That assertion does not appear to be disputed.

In this circumstance, the analysis of *Mabon* offers support for Parent's position on two bases. First, Utility pleaded and proved before the PUC sufficient facts to support Parent's retention of ultimate ownership and control of, and responsibility for, the obligations of Utility. Second, if Utility prevails in this appeal, the positions taken before the PUC and this Court on that issue will estop both Parent and Utility from asserting in the future that Parent lacks such ownership, control, and responsibility.[3]

---

[3] *See* the discussion of judicial estoppel above.

In my opinion, based on this analysis, the PUC erred in refusing to pierce the corporate veil as Parent and Utility themselves requested. The PUC offers no reason why Parent may not avail itself of corporate separation for financial purposes while still retaining ultimate ownership and control of Utility for purposes of compliance with the PUC's governing statute and regulations. Therefore, I respectfully dissent from the majority's refusal to pierce the corporate veil here.

### C. "Substantial Affirmative Public Benefit" Standard

In *City of York v. Pennsylvania Public Utility Commission*, 295 A.2d 825 (Pa. 1972), our Supreme Court affirmed the decisions of the PUC and this Court approving a merger of three telephone companies.[4] Our Supreme Court disapproved its prior decisions applying a standard that merely required no harm to the public; instead, the Court explained that the terms of Section 1102(a)(3) required demonstration of a substantial affirmative public benefit. *Id.* at 828.

However, our Supreme Court in *City of York* pointed with approval to the PUC's determination that the ***anticipated public benefits included formation of a stronger company, ease of obtaining capital in money markets, and lower administrative costs***. *Id.* at 828-29. Although the PUC did not expressly find the merger would provide an affirmative public benefit, our Supreme Court concluded the PUC's determination that financial benefits would result from the merger constituted such a finding. *Id.* at 829. As the Court observed, "the [PUC's] explicit finding that the merger would result in 'considerable' economies can only be taken as an indication of the [PUC's] belief that the merger would in fact have a beneficial effect upon rates." *Id.* Further, the Court pointed to the PUC's determination that

---

[4] All three companies were owned by the same holding company, and the same person served as president of all three companies. Notably, however, the *City of York* opinion does not suggest the proposed merger was a mere internal restructuring as asserted by Utility here.

EC - 13

because of the economies that would result from the merger, the utility's subscribers would be beneficiaries of the merger. *Id.* at 830. *See also McCloskey v. Pa. Pub. Util. Comm'n*, 195 A.3d 1055 (Pa. Cmwlth. 2018) (evidence forecasting ***better management practices, economies of scale, increased operational efficiencies, and lack of adverse effects on customer service constituted substantial evidence of affirmative public benefit***, in support of merger transaction).

Here, the record demonstrates the same kinds of financial benefits recognized in *City of York*, including a stronger company, ease of access to money markets, improved administrative efficiencies, and tax benefits. Moreover, the majority expressly acknowledges the financial benefits of internal restructuring through the expedient of holding companies, citing internal structural advantages, shelter against legal liability, tax benefits, furthering strategic corporate financial objectives, financial flexibility, capital infusions and capital market access for subsidiaries, and additional cash flow. *See* Majority op. at 18.

The PUC does not contend otherwise. The PUC simply argues that such benefits do not demonstrate that Parent's proposed restructuring would provide a substantial affirmative benefit to the public or to Utility's customers. That argument is contrary to our Supreme Court's opinion, and the PUC's own reasoning, in *City of York*.

I agree with the majority's conclusion that previous applications of the substantial affirmative benefit test in the context of proposed mergers, which have anticompetitive overtones not present here, are inapt in analyzing purely internal restructuring. The majority reasons that a certificate of public convenience should be granted on a determination that the proposal at issue would be necessary ***or proper*** to serve the public need. Majority op. at 20. Thus, the majority holds that the PUC

could issue a certificate of public convenience based on a determination that it would be ***proper*** for the service of the public. *Id.* (citing Section 1103(a) of the Public Utility Code, 66 Pa. C.S. § 1103(a)). I do not disagree with this as a statement of law. However, I do not believe the Court needs to reach that issue here, because, as discussed above, financial advantages to the parent and subsidiary constitute substantial affirmative public benefits justifying issuance of a certificate of public convenience. The PUC erred in concluding otherwise.

Importantly, Utility did not have to prove with precision what specific financial benefits would arise from the proposed restructuring. As this Court explained in *McCloskey*, it is not necessary to offer specific evidence on how a transaction will offer substantial affirmative public benefits. Evidence that is general in nature may support a finding of a public benefit sufficient to justify a determination that the requested transaction is in the public interest. *McCloskey*, 195 A.3d at 1065 (citing *Popowsky v. Pa. Pub. Util. Comm'n*, 937 A.2d 1040 (Pa. 2007)).

Therefore, even if a certificate of public convenience was required, Utility met its burden of showing a substantial affirmative public benefit by establishing the financial advantages of Parent's proposed restructuring. The PUC committed legal error by concluding otherwise.

## IV. Conclusion

For the reasons discussed above, I would reverse the PUC's decision and find that no certificate of public convenience was required for Parent's proposed internal restructuring. I would further find that even if a certificate of public convenience was required, the PUC erred as a matter of law by determining that the anticipated financial advantages demonstrated no substantial affirmative public benefit from

EC - 15

Parent's proposed internal restructuring.  Therefore, respectfully, I also disagree with the majority's conclusion that a remand is necessary for the PUC to issue a new decision applying a different legal standard to determine whether to grant a certificate of public convenience.

_____
ELLEN CEISLER, Judge

President Judge Leavitt and Judge Crompton join in this dissenting/concurring opinion.